UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

BEFORE THE HONORABLE STACEY G. JERNIGAN, CHIEF JUDGE

| | |
|---|---|
| In Re: | ) Case No. 23-30690-sgj7 |
| | ) |
| ISMAIL ESSA BHAI, | ) |
| | ) |
| Debtor. | ) |
| | ) |
| ———————————————— | ) |
| | ) |
| BENEFIT STREET PARTNERS REALTY | ) Adv. No. 23-03042-sgj |
| OPERATING PARTNERSHIP, L.P., and | ) |
| BSP of FINANCE, LLC, | ) |
| | ) |
| Plaintiffs, | ) <u>PLAINTIFF'S MOTION</u> |
| | ) <u>for SUMMARY JUDGMENT</u> |
| v. | ) |
| | ) |
| ISMAIL ESSA BHAI, | ) |
| | ) |
| Defendant. | ) June 10, 2024 |
| ———————————————— | ) Dallas, Texas |

<u>Appearances</u>:

| | |
|---|---|
| For Plaintiff-Movant Benefit Street Partners, L.P.: | Adam D. Herring<br>Lee B. Hart (via WebEx)<br>Nelson Mullins Riley & Scarborough, LLP<br>201 17th Street, N.W., Suite 1700<br>Atlanta, Georgia  30363 |
| For the Debtor-Defendant: | Joyce W. Lindauer<br>Sydney Ollar<br>Joyce W. Lindauer Attorney, PLLC<br>1412 Main Street, Suite 500<br>Dallas, Texas  75202 |
| Digital Court Reporter: | United States Bankruptcy Court<br>Northern District of Texas<br>Michael F. Edmond Sr., Judicial<br> Support Specialist<br>Earle Cabell Building, U.S. Courthouse<br>1100 Commerce Street, Room 1254<br>Dallas, Texas  75242 |
| Certified Electronic Transcriber: | Susan Palmer, CERT 00124<br>Palmer Reporting Services |

Proceedings recorded by digital recording;
transcript produced by federally-approved transcription service.

*Plaintiff's Motion for Summary Judgment*                                    2

| | |
|---|---|
| Monday, June 10, 2024 | 2:35 o'clock p.m. |

P R O C E E D I N G S

COURT SECURITY OFFICER:  All rise.

THE COURT:  Good afternoon.  Please be seated.

All right.  We have a hearing on a motion for summary judgment in Benefit Street Partners versus Bhai, Adversary 23-3042.  We will get appearances first from the movants, please.

MR. HERRING:  Good afternoon, Your Honor.  Adam Herring on behalf of Benefit Street, the plaintiff in this action.  On WebEx observing are Lee Hart, from my firm Nelson Mullins, and Mike Comparato (phonetic) from Benefit Street.

THE COURT:  All right.  Thank you.

Next.

MS. LINDAUER:  Your Honor, Joyce Lindauer and Sydney Ollar here on behalf of Ismail Bhai, the debtor and also the defendant in this adversary proceeding.

THE COURT:  Okay.  Thank you.

MS. LINDAUER:  Thank you.

THE COURT:  All right.  Mr. Herring, I got two giant notebooks up here.  So I am ready to hear your argument.

MR. HERRING:  Thank you, Your Honor.  And apologies for the size of the notebooks.

THE COURT:  It is what it is.

MR. HERRING:  It is what it is.

*Plaintiff's Motion for Summary Judgment*                    3

1          THE COURT:  Right.

2          MR. HERRING:  Thank you.  Good afternoon, Your Honor.

3   Again, Adam Herring with Nelson Mullins on behalf of Benefit

4   Street.  We are here on Benefit Street's motion for summary

5   judgment in this 523 and 727 dischargeability proceeding.

6          It's often repeated but true in this case and every

7   other case that a bankruptcy discharge is intended to benefit

8   only honest but unfortunate debtors.  Here, the maxim again

9   holds true.  This debtor has been dishonest to Benefit Street,

10  he's been dishonest to his other creditors, he's been dishonest

11  in this litigation, and he's been dishonest to this Court.  This

12  conclusion is not just my client's or mine, it's born out by

13  indisputable facts which we pled out in our brief, will discuss

14  today, and more than 1500 pages of appendix materials.

15         It's born out by the debtor's disgraceful conduct of

16  this case in this litigation, which has not only been infected

17  by his and his family's dishonesty but outright contempt for the

18  judicial process.  And it's born out by the debtor's own

19  deposition testimony, which, in the final assessment, is

20  incomprehensible in its implausibility and inconsistency.

21         Simply put, Your Honor, in almost 15 years of practice

22  in bankruptcy law exclusively, including representing individual

23  debtors, including defending individual debtors in adversary

24  proceedings, and including with working at the Executive Office

25  for U.S. Trustees overseeing civil enforcement, I have

*Plaintiff's Motion for Summary Judgment*                                        4

1    personally never encountered a more disturbing case of fraud or

2    a debtor less interested in participating honestly in the

3    process.

4            This debtor is not honest.  And if he's unfortunate,

5    that misfortune is of his own making.  The only just outcome

6    here is denial of his discharge.

7            In a few minutes, Your Honor, I will walk somewhat

8    painstakingly through the legal standards for summary judgment

9    and their application to our claims for relief, along with the

10   material factual support for each of those claims.  But first

11   I'd like to set the stage, you know, with the Court's indulgence

12   for a few minutes.

13           The debtor Ismail Bhai is the patriarch of what can

14   fairly be described as a close-knit family consisting of:  The

15   debtor; his former spouse Rozmeen Bhai; and his adult son

16   Raheel, sometimes going by Ray Bhai.  The three at all times

17   relevant to this litigation and for years before and currently

18   continuously live together in a house owned by the debtor at

19   2216 Glacier Court in Carrollton.  The three work together,

20   owned numerous business interests together, they ate meals

21   together, they attended religious services and events together,

22   and they travel together.  Ultimately, as we'll discuss, they

23   defrauded Benefit Street together.  Before that, likely other

24   victims.

25           Turning to the Benefit Street loan that underlies all

*Plaintiff's Motion for Summary Judgment*                                    5

1    of this — this case.  The Bhais including the debtor were

2    involved in real estate investments prior to the events

3    precipitating this litigation of Benefit Street's involvement.

4    Along the way of that business, they picked up a portfolio of 24

5    commercial properties across 10 states, each having a Walgreens

6    store as an existing tenant.

7          In early 2022, through an entity — entity called IBF

8    Properties, LLC, the debtor and his family approached Benefit

9    Street to refinance the Walgreens portfolio.  Benefit Street

10   ultimately agreed to that loan.  And on April 18th, 2022, they

11   entered into — IBF and Benefit Street entered into a loan

12   agreement.  And IBF executed two promissory notes in the total

13   amount of $149,700,000, in favor of Benefit Street, and executed

14   24 security instruments, one for each Walgreens store, in

15   Benefit's favor.

16         The underlying documents for the loan, the loan

17   agreement, is at page 121 of the Appendix.  The promissory notes

18   start at page 284 of the Appendix.  And the secured instruments

19   are discussed in Mr. Grimbley's (phonetic) affidavit at page

20   1559 of the Appendix.

21         Raheel — I'm just going to go by first names for the

22   Bhais, Your Honor, by the way, just for simplicity.

23         THE COURT:  Okay.

24         MR. HERRING:  Raheel executed the loan documents on

25   behalf of IBF.  That signature is at the Appendix at page 259.

*Plaintiff's Motion for Summary Judgment*                                        6

1   Nominally, IBF was almost entirely owned and managed by Raheel.

2   That's in the Appendix at page 658.  But this was merely a

3   facade.  As discussed above, the Bhais, including the debtor, as

4   a unit controlled and owned all of the family businesses.  The

5   debtor, despite repeatedly disavowing, including in his

6   depositions, any knowledge of the loan while it was being

7   negotiated and closed, among other things, engaged in email

8   correspondence, attempting to write insurance policies in his

9   capacity as a Farmer's Insurance agent, on the collateral

10  property's underlying loan.

11          And that — that email thread — I'm sorry.  I can slow

12  down if Your Honor wants to catch up to the Appendix that's —

13          THE COURT:  Well, yeah.  I do want to be able —

14          MR. HERRING:  Yeah.

15          THE COURT:  — to pinpoint the email thread on that.

16          MR. HERRING:  Okay.  The email thread is page 1452 to

17  '59 of the Appendix, Your Honor.

18          THE COURT:  Okay.  1452.

19          MR. HERRING:  I'm sorry.

20          THE COURT:  Okay.  The — this is Harbor Insurance

21  Advisory.  That's from someone, Jasmine Drinkwater (phonetic)

22  there, to Ray Bhai.  And then the stamp marking is — it looks

23  like it's just to Ray Bhai, but then...

24          MR. HERRING:  Let me — I'm sorry, Your Honor.  I'm

25  turning there myself.

*Plaintiff's Motion for Summary Judgment*                              7

1        THE COURT:  And there is a cc to Ismail on the bottom

2    of 1453.

3        Okay.  I don't want to get too bogged down, but in —

4    one of the things that's at the forefront of my mind is the loan

5    agreement, the promissory notes were signed by Ray?

6        MR. HERRING:  Correct, Your Honor.

7        THE COURT:  And what is my material summary judgment

8    evidence that's not in dispute that Ismail participated or, you

9    know, made representations or participated in an actual fraud

10   pertaining to that loan?

11       MR. HERRING:  Your Honor, our evidence of the fraud

12   that we don't believe is in material dispute related — this is

13   particularly for the 523 claim, in the participation in the

14   loan, is this email correspondence, which I will pinpoint in a

15   second Ismail's participation.  And also we argue that Ismail's

16   guaranty of the loan, which he made after the fraud was

17   discovered, indicates his involvement.

18       THE COURT:  Okay.  And —

19       MR. HERRING:  Sort of a logical —

20       THE COURT:  — separate transaction, but —

21       MR. HERRING:  Correct — correct, Your Honor.

22       THE COURT:  — I'm — the original transaction, I'm just

23   zeroing in on at the moment.

24       MR. HERRING:  And, Your Honor, the Ismail's — excuse

25   me — the debtor's participation in the email thread actively is

*Plaintiff's Motion for Summary Judgment*                                    8

1    at page 1457.

2              THE COURT:  Okay.

3              MR. HERRING:  Kind of starting at around the middle of

4    the page.

5              THE COURT:  So this is an email from Ismail to Nicole

6    Napolitano (phonetic) at Benefit Street, working on what the

7    policy would be, and stated:  And you should have it Monday.  So

8    he's corresponding with someone at Benefit.

9              MR. HERRING:  Correct, Your Honor.

10             THE COURT:  And then on the next — the previous page,

11   I guess — the next page has the previous email, April 5th.

12   Ismail:  I'm with the lender's team.  We're trying to finalize

13   the insurance.  Okay.

14             MR. HERRING:  Shall I continue, Your Honor?

15             THE COURT:  Go ahead, uh-huh.

16             MR. HERRING:  Okay.  Yes.  Thank you.

17             At closing of the loan, Your Honor, also on April

18   18th, 2022, the loan proceeds were disbursed to pay off existing

19   secured debt, as listing on the closing statement.  And the

20   closing statement for the loan is at page 1364 of the Appendix.

21             THE COURT:  Okay.

22             MR. HERRING:  And it's — it's a lengthy closing

23   statement.  And there were multiple payoff line items to each of

24   these lenders.  So, to total it all up and summarize it:

25   $112,533,891.35 in total was paid to Revere Capital at closing;

*Plaintiff's Motion for Summary Judgment*                    9

1   $11,709,023.59 was paid to AccessBank Texas at closing; and

2   $21,906,500 was paid to EPI Commercial Finance at closing.

3        The problem, Your Honor, is that while Revere and

4   AccessBank were real lenders, EPI was not.  EPI was formed just

5   days before the closing for the sole purpose of fraudulently

6   receiving the proceeds of the loan.  This is a fact that Raheel

7   admitted in connection with his criminal prosecution in a plea

8   arrangement, in a — excuse me — the factual résumé underlying

9   his plea arrangement.  That is in the Appendix at page 1304.

10       EPI opened its bank account on April 8th, 2022, just

11  10 days before closing of the Benefit Street loan, as evidenced

12  by the account signature card.  And I'm sorry to skip around,

13  Your Honor.  That's in the Appendix at 1114.

14       THE COURT:  Um-hum.

15       MR. HERRING:  On April 8th, 2022, the day it was

16  opened, of course EPI's Bank of America account had a zero

17  dollar balance.  In the month of April, it received $21,909,500

18  in deposits.  And the bank statement reflecting that deposit is

19  at page 1368, consisting of a $3,000 initial deposit on April

20  11th, and then 20 — the $21,906,500 — I'll just call it $21

21  million from now on — in loan proceeds on April 19th.  That

22  shows on page 1370 of the Appendix.

23       That almost $22 million deposit only stayed in EPI's

24  account momentarily.  On April 19th, the very same day it was

25  put in the account, all but a thousand dollars were transferred

1   out of EPI's account, as a funds tr- — listed on that page of

2   the statement as a funds transfer debit.  That $22 million went

3   directly to another Bank of America account, one owned by the

4   debtor and his family.  This statement is at page 1166.

5          On its face, that account was owned by the debtor,

6   along with Raheel and Rozmeen, per both the account statements

7   and the account signature card.  The account signature card is

8   in — at page 1101 of the Appendix.

9          Like the EPI account, this family account had a zero

10  dollar balance at the beginning of the April statement month.

11         Continuing to follow that $22 million, the debtor and

12  his family began to dissipate it almost as soon as they skimmed

13  it from the loan.  The April bank statement shows more than six

14  and a half million dollars in other subtractions, which is how

15  wire transfers are listed.  These transfers in the statement are

16  at pages 1166 through 1168 of the Appendix.  We have listed them

17  out at paragraph 19 of our brief.  I can walk through them if

18  Your Honor would like, but they're — they're numerous.  I can

19  represent that they total more than $11 million across April,

20  June, and July.  And June transfers are at pages 1380 to '86 of

21  the Appendix.  July transfers are at pages 1092 to 1093 of the

22  Appendix.

23         We submit that none of these third parties had any

24  reason to be paid out of the debtor's funds.

25         Third parties were not the only beneficiaries of the

*Plaintiff's Motion for Summary Judgment*                              11

1   $22 million in loan proceeds.  Beside transferring money to

2   those third parties, the debtor and his family arranged to

3   conceal their assets through a complex series of transfers among

4   their own diverse financial accounts.

5          On June 2nd, 2022, $3.8 million approximately was

6   wired from the debtor's family Bank of America account to an

7   investment account at Goldman Sachs, also in the debtor's name,

8   along with the names of Raheel and Rozmeen.  And the support for

9   that is at page 1385 and 1395 of the Appendix.

10         On July 15th, 2022, about six weeks later and on the

11  eve of the Bhais' flight from the country, which we'll discuss

12  in a minute, the Bhais transferred $4,661,771 from Goldman Sachs

13  back to yet another Bank of America account, this one in

14  Rozmeen's name.  That is in the Appendix at 1404.

15         And just three days later, Your Honor, on July 18th,

16  $4,651,901.55 was transferred from Rozmeen's account back to the

17  family Bank of America account.  That shows — also shows on page

18  1404.

19         The obfuscation continued as the debtor and his family

20  then moved to conceal assets and prepare to escape justice by

21  converting the money into crypto currency.  Your Honor is aware

22  from our hearing last week of the transaction with Di Hao Zhang.

23  The Bhais hired Mr. Zhang because he's active in the crypto

24  space.  He stayed at the Hampton Inn owned by the Bhais.  And

25  the debtor and Raheel drove from Dallas to near Austin to bring

*Plaintiff's Motion for Summary Judgment*                    12

1   him to the Hampton Inn.  That's per the debtor's own testimony

2   at pages 709 to 710 of the Appendix.  And that is part of the

3   debtor's deposition transcript.

4         On July 18th, two and a half million dollars was wired

5   out of the family Bank of America account to Mr. Zhang.  On July

6   19th, another $2.149 million was wired to Mr. Zhang.  And on

7   July 22nd, an additional total of $260,260 was wired to Mr.

8   Zhang.  That's in the Appendix at page 495.

9         At a minimum, the debtor was not only aware of the

10  transaction with Mr. Zhang, he personally directed at least the

11  two and a half million dollar wire transfer per the wire advice

12  at page 496 of the Appendix, which lists him as the originator.

13        I will now turn to how Benefit Street discovered that

14  they had been defrauded.

15        The debtor and his family were apparently not

16  satisfied with defrauding Benefit Street once.  And shortly

17  after the loan closed, they approached Benefit Street for a

18  second larger loan to be secured by a portfolio of Walgreens

19  stores.  During due diligence for the second loan, the Bhais

20  provided Benefit Street with information that raised red flags

21  and Benefit Street re-examined the loan — excuse me — the

22  original Walgreens loan.  At this point, Benefit Street learned

23  it had been defrauded.  That's — the support for that is at Mr.

24  Goodman's (phonetic) declaration at page 1560.

25        Benefit Street confronted Raheel, and he admitted to

*Plaintiff's Motion for Summary Judgment*                    13

1    the scheme.  He requested an opportunity to quickly repay the

2    loan, and Benefit Street agreed, provided that that repayment

3    came from legitimate funds.  Also in the Appendix at page 1560.

4            Ultimately, the Bhais agreed to a structure to repay

5    Benefit Street and provide additional assurances.  Specifically,

6    on July 13th, Raheel and IBF, as the loan borrower, executed a

7    forbearance agreement with Benefit Street.  The forbearance

8    agreement is in the Appendix at page 435.

9            Under the forbearance agreement, Raheel and IBF, as

10   the loan borrowers, admitted that they — that forged and

11   falsified documents were submitted to Benefit Street, that

12   Benefit Street relied on those documents to make the loan and

13   would not have made the loan had the documents been true and

14   correct, and that Raheel would not leave or transfer his assets

15   outside the U.S.  Raheel also executed an amended and restated

16   guaranty of the loan.  He was the original guarantor under the

17   loan as well.  And, for the first time, the debtor and Rozmeen

18   executed guaranties of the entire loan and also agreed not to

19   reduce their net worth or transfer any of their assets.  I'm

20   sorry.  And the debtor's guaranty of the loan is in the Appendix

21   at page 487.

22           Negotiating and signing these agreements bought the

23   Bhais some time.  They used the time spent negotiating and the

24   eight days after signing the forbearance documents to finish

25   dissipating their assets, including the crypto currency

*Plaintiff's Motion for Summary Judgment*                    14

1    transaction described above and putting their affairs in order

2    for the next move.  That next move was to disappear.

3           It's undisputed, and the debtor admitted in his

4    deposition, that on July 21st, 2022, the debtor, Raheel, and

5    Rozmeen.  This is — deposition testimony is at page 711.  The

6    debtor testified that he drove and the family took either his

7    Mercedes or a Range Rover that the family owned, and the family

8    left the car in short-term parking at DFW.  That's also at page

9    711.  I will note, Your Honor, that the family had no return

10   flights booked.

11          The family stopped in Dubai where Raheel and Rozmeen

12   connected on to Pakistan, while the debtor stayed with a friend

13   in Sharjah in the United Arab Emirates for about three weeks.

14   That's in the Appendix at page 712 to '13.

15          Ultimately, Your Honor, the debtor and his family

16   stayed in Pakistan for approximately eight months.  They

17   admittedly did not return until they had made arrangements to

18   address the legal consequences facing them in the United States.

19   That's at page 714 of the Appendix.

20          The debtor also testified that he lost his Farmer's

21   Insurance agency because of the length of time he was away.

22   That's in the Appendix at pages 684 and 713.

23          And former employees of the Hampton Inn owned by the

24   family have testified that when the fled, the Bhais removed

25   boxes of documents from the Hampton Inn.  They also left a

*Plaintiff's Motion for Summary Judgment*                    15

1   shredder and bags of shredded documents at the hotel.  This is

2   in the Appendix at page 1549.  That's a deposition of one of the

3   hotel employees.

4        While the debtor and his family were away, Benefit

5   Street sued them, naturally, and the businesses that they had

6   used to defraud Benefit Street, and obtained a judgment for

7   $158,613,381.88 in damages, jointly and severally, plus

8   15-percent postjudgment interest.

9        As for criminal consequences for the obvious

10  misconduct here, the debtor and Rozmeen appear content to allow

11  Raheel, their only child, to take all responsibility.  He's

12  negotiated a plea deal which, if approved, when he's eventually

13  sentenced will see him facing a 10-year sentence for federal

14  wire fraud.

15       The debtor filed, for his part, filed this Chapter 7

16  case on April 5th of 2023.  Benefit Street filed this proceeding

17  on June 9th.  As the Court is unfortunately aware, litigation of

18  this case has been fraught, we submit, entirely as the result of

19  obstructionist conduct by the debtor and his family.

20       The Court may of course take judicial notice of its

21  orders in this case, including its multiple orders compelling

22  the debtor, Raheel, and Rozmeen to comply with basic discovery

23  obligations and ultimately sanctioning them.  I will note that

24  monetary sanctions ordered by the Court against the debtor

25  remain unpaid.

*Plaintiff's Motion for Summary Judgment*                                    16

1        I submit, Your Honor, that the debtor's pervasive

2    misconduct throughout this case, the abuse of process, and

3    contempt for the Court's authority are all valid areas of

4    concern and consideration as the Court evaluates the debtor's

5    entitlement to a discharge.  I also submit, Your Honor, that the

6    Court can take Raheel and Rozmeen's litigation misconduct into

7    account.  Given the connection between the three living

8    together, it seems fairly obvious and likely that they have

9    coordinated their — their conduct in this case.

10       Turning to legal standards for summary judgment, Your

11   Honor, the standards are well known and well understood.  A

12   party is entitled to summary judgment if it can demonstrate no

13   issue of — genuine issue of material fact and that it's entitled

14   to judgment as a matter of law.  That of course is in Rule 56(a)

15   and the *Celotex* case.

16       A fact issue is material if its resolution, one way or

17   the other, affects the outcome of the action.  That's from

18   *Anderson versus Liberty Lobby*.  Not every dispute is material.

19   The mere existence of some alleged factual dispute between the

20   parties will not defeat an otherwise properly-supported motion

21   for summary judgment.  A dispute-over-material-fact question is

22   genuine if the evidence will permit a reasonable finder of fact

23   to find in favor of the nonmovant.

24       In other words, the debtor's mere unsupported denials

25   of Benefit Street's allegations don't, by themselves, create

*Plaintiff's Motion for Summary Judgment*                                    17

1    genuine disputes of fact.

2         And of course the Court should generally resolve facts

3    and resolve disputes in favor of the nonmoving party.

4         As the Court knows, many of the Section 727 claims

5    require a showing of the debtor's fraudulent intent, and we

6    submit and will discuss further that there is ample evidence of

7    that intent.

8         I also want to note that Benefit Street deposed

9    Raheel, who asserted the Fifth Amendment privilege in response

10   to every meaningful question.  His deposition transcript is at

11   pages 1308 to '31 of the Appendix.

12        We submit that it's appropriate for the Court, within

13   the Court's discretion, to draw negative inferences against the

14   debtor based on those assertions.  There is case law —

15        THE COURT:  Now it was —

16        MR. HERRING:  Sorry.

17        THE COURT:  — was Ray, Raheel —

18        MR. HERRING:  Raheel.

19        THE COURT:  — who asserted the Fifth.

20        MR. HERRING:  Correct, Your Honor.  The debtor did —

21   never asserted the Fifth, just to correct the record —

22        THE COURT:  Okay.  I can make negative inferences as

23   to the debtor with regard to his son's assertion of the Fifth?

24        MR. HERRING:  There is case law supporting the idea

25   that within the Court's discretion, you can draw the negative

1    inference in a civil proceeding.  The case I have for that is

2    *FDIC versus Fiduciary and Deposit Company of Maryland* [sic];

3    that is a Fifth Circuit case from 1995.

4              THE COURT:  Where it was someone else asserting the

5    Fifth, not a debtor —

6              MR. HERRING:  Correct, Your Honor.

7              THE COURT:  Okay.

8              MR. HERRING:  Correct.  That was not a bankruptcy

9    case, but it was — it was a third party, not the litigant.

10             THE COURT:  Okay.

11             MR. HERRING:  Your Honor discussed this in a footnote.

12   I'm not sure that you actually applied it in this case, but Your

13   Honor discussed the possibility of doing it in a footnote in the

14   *Correra* case, 589 B.R. 76, from 2018.

15             THE COURT:  Um-hum.

16             MR. HERRING:  The case law doesn't show that any

17   special relationship between the nonparty invoking the Fifth

18   Amendment and the party against whom the adverse interest is

19   sought is required, but we do submit that the relationship

20   between Ray and the debtor weighs in favor of the Court drawing

21   the negative inference.

22             The debtor and Rozmeen's and Raheel's — well, Raheel's

23   assertion of the Fifth and the debtor and Rozmeen's kind of

24   collective ignorance or claimed ignorance and forgetfulness as

25   to basically every material issue all strikes us as coordinated

*Plaintiff's Motion for Summary Judgment*                    19

1    to make it as difficult or — as possible for Benefit Street or

2    the Court to ferret out what really happened here.

3            I will pause at this point for any questions.  But if

4    not, I am prepared to go into each claim we have.

5            THE COURT:  Go ahead.

6            MR. HERRING:  Thank you.  Okay.

7            Your Honor, Benefit Street's first claim for relief is

8    under Section 523(a)(2)(A) for nondischargeability of Benefit

9    Street's debt.  The elements of nondischargeability under

10   Section 523(a)(2)(A) are:  That there was a debt for money,

11   property, services, or an extension, renewal, or refinancing of

12   credit; that the debt was obtained by false pretenses or false

13   representation or actual fraud — other than a statement

14   respecting the debtor's financial condition.

15           We think there are two theories under which summary

16   judgment is appropriate under Section 523.  First is our theory

17   under the Supreme Court's recent decision in *Bartenwerfer*.

18   *Bartenwerfer* of course held that a debt may be nondischargeable

19   based on a nondebtor's fraudulent conduct because, as Justice

20   Barrett explained, written in the passive voice, Section

21   523(a)(2)(A) turns on how the money was obtained and not who

22   committed the fraud to obtain it.

23           *Bartenwerfer* involved a debtor who, along with her

24   boyfriend-later spouse, purchased a house in order to remodel it

25   and flip it for a profit.  The debtor herself was not primarily

*Plaintiff's Motion for Summary Judgment*                    20

1   involved in the project, leaving it to her partner to manage it,

2   manage the construction.  The house sold, but it turned out to

3   have had major defects, and the buyer sued the debtor and her

4   partner for misrepresentations in the sale disclosures.

5        Although after litigation in state court, only the

6   partner was found to have had fraudulent intent, the Ninth

7   Circuit held that the claim against Ms. Bartenwerfer — excuse me

8   — against Ms. Bartenwerfer was nondischargeable as a debt

9   obtained by her partner's fraud, applying an earlier Supreme

10  Court decision in *Strang versus Bradner* from 1885.

11       The Supreme Court agreed and reaffirmed *Strang*.  Even

12  though *Strang* was decided under the 1867 Bankruptcy Act, the

13  passive language in the current statute, which actually didn't

14  exist under the Bankruptcy Act, reinforced its applicability.

15       Even the minority concurring view of liability in

16  *Bartenwerfer* held that this sort of imputed liability extends to

17  business partners and other people within a sort of special

18  relationship to the — to the party charged who actually

19  committed fraud.  We think *Bartenwerfer* clearly applies, and

20  there is no genuine dispute of material fact.

21       First, Raheel expressly admitted in both the

22  forbearance agreement and his plea agreement that he obtained

23  the loan through fraud and that Benefit Street relied on that

24  fraud in making the loan.  That the loan was fraudulently

25  obtained from Benefit Street is not subject to any genuine

*Plaintiff's Motion for Summary Judgment*          21

1  dispute.  For purposes of 523(a)(2)(A), it is a debt obtained by

2  fraud.

3         Second, there is no genuine dispute that the debtor is

4  within the range of parties to whom liability could be imputed

5  under *Bartenwerfer*, even as narrowly prescribed by the

6  concurring opinion.  The debtor, Raheel, and Rozmeen

7  continuously lived together, ate meals together, shared

8  financial accounts, and transacted business with — with others

9  and among each other.  Specifically, they worked together on the

10 loan transaction.  The debtor was aware of it despite his lies

11 to the contrary.  As mentioned, he even attempted to write the

12 insurance policies on the collateral.  And the debtor

13 affirmatively and voluntarily guaranteed the loan and then fled

14 together with the rest of the family when things fell apart.

15        It's clear to us that the debtor's relationship with

16 Raheel vis-a-vis the loan is covered by *Bartenwerfer*.  Because

17 the debtor is liable on Benefit Street's debt and because it was

18 incurred by Raheel's fraud, it is nondischargeable.

19        We also think, Your Honor, that the debtor would be

20 liable under a traditional 523(a)(2)(A) theory.

21        Actual fraud under 523(a)(2)(A), under the classic

22 method, requires the debtor to have made a false representation

23 with intent to deceive the creditor that the creditor actually

24 and justifiably relied on to its detriment.  My cite for that is

25 the *Zolnier* case, 2021 WestLaw, 5778461, Fifth Circuit, December

*Plaintiff's Motion for Summary Judgment*                    22

1   6, '21 — 2021.

2          But additionally actual fraud for purposes of

3   523(a)(2)(A) includes forms of fraud like fraudulent-conveyance

4   schemes that can be effected without a false representation.

5   And that's from the *Ritz* case in the Supreme Court, 578 U.S. 356

6   from 2016.

7          Again, the debtor, Raheel, and Rozmeen lived together

8   and worked together continuously in close quarters.  The debtor

9   was aware that the loan was being sought and attempted to earn a

10  commission by ensuring the collateral.  But, more tellingly, the

11  debtor's postfraud actions indicate his direct involvement.  He

12  executed a guaranty of the loan that is completely nonsensical

13  were he not involved in its origination.  He actively

14  participated in transferring and secreting the proceeds of the

15  fraud.  Finally, he fled the country indefinitely, only

16  returning when he was safe in the sense that Raheel was taking

17  on the family's collective criminal liability.

18         And, finally, the uncontroverted evidence presented in

19  the motion has caught the debtor in his numerous lies and

20  misrepresentations regarding his involvement in the family

21  business, some of which we'll get to in a minute.

22         The debtor's liability to Benefit Street under Section

23  523 has been established as a matter of law and a matter of

24  genuine nondisputable fact.  Summary judgment should be granted.

25         Benefit Street's second claim for relief under Section

*Plaintiff's Motion for Summary Judgment*                                    23

1    — is under Section 27(a)(2)(A), which would deny a debtor a

2    discharge if they:  With intent to hinder, delay, or defraud a

3    creditor or the estate, have transferred, removed, destroyed,

4    mutilated, or concealed property within one year before the

5    petition date.

6            Intent is a necessary element.  And in the Fifth

7    Circuit, courts look to the following factors to determine

8    intent — fraudulent intent.  This is a six-factor test:  Lack or

9    inadequacy of consideration; a familiar or close relationship

10   between the parties; retention of possession, benefit, or use of

11   the property in question; financial condition of the debtor

12   before and after the transaction; the existence of a pattern or

13   course of conduct after the onset of financial problems or

14   creditor suits or threats; and the general chronology of the

15   events and transactions in question.  That's from *In re Chastant*

16   — Chastant, I assume — 873 F.2d 89, at 90, a Fifth Circuit 1989.

17           We have outlined the millions of dollars in transfers

18   out of the debtor's account, all directly following and out of

19   the proceeds of the loan, all within a year of the petition

20   date.  Indeed, all of these transactions occurred in the two or

21   three months between the closing of the loan and the Bhais'

22   flight from the country.

23           Moreover, the shuffling of millions of dollars through

24   the debtor's account following the fraud, including the crypto

25   currency transaction we described, fits within the definition of

*Plaintiff's Motion for Summary Judgment*                    24

1   concealment.  Uncontroverted evidence shows that the debtor

2   directly participated in these transactions.

3           Moreover, there are substantial assets that are

4   unaccounted for.  None of the Bhais including the debtor have

5   accounted for more than a million and a half dollars of jewelry

6   or the disposition of the family's vehicles.  These are not

7   inconsequential transfers or a concealment.  They point to an

8   organized scheme to skim from the loan proceeds and then

9   dissipate them out of the reach of the debtor's creditors.

10          The indicia of fraudulent intent under *Chastant* are

11  present.  Under these circumstances, summary judgment under

12  727(a)(2)(A) is appropriate.

13          Our third claim for relief, Your Honor, is under

14  Section 727(a) through (a)(3) —

15          THE COURT:  Can I back up?

16          MR. HERRING:  I'm sorry.  Yes, Your Honor.  Certainly.

17          THE COURT:  The jewelry, what is my summary judgment

18  evidence of jewelry?  I remember very well, —

19          MR. HERRING:  Sure.  I'll —

20          THE COURT:  — he said all I have is a $20 Timex that's

21  broken.  I'm holding up my hand as though I can see —

22          MR. HERRING:  Oh, sure.

23          THE COURT:  — him.  I can't see him.  I just read it

24  and had that visual image.  And then you have mentioned that a

25  jewelry box was found in the hotel after they left town, but I

*Plaintiff's Motion for Summary Judgment*                    25

1    wasn't sure what other summary judgment evidence other than a

2    picture of a box.

3              MR. HERRING:  Sure, Your Honor.  We'll come — we'll

4    come back to this when we discuss the debtor's false oaths.

5    But, to jump ahead to that, —

6              THE COURT:  Okay.

7              MR. HERRING:  — at pages 1235 through 1300 of the

8    Appendix are jewelry store receipts that we obtained in

9    discovery.

10             THE COURT:  Okay.  Govindji's.

11             MR. HERRING:  Govindji's Jewelry, yes, Your Honor.

12             THE COURT:  Okay.

13             MR. HERRING:  The jewelry here consists of more than a

14   122 karat gold — sets of gold bangles, some very expensive

15   diamonds including an almost $300,000 pair of earrings listed on

16   the first page.  These total up to more than a million and a

17   half dollars, Your Honor.  And despite these receipts, neither

18   the debtor nor any of his family has been willing to be

19   forthcoming about the existence or location of these items.  The

20   debtor claimed he had no idea about them.  That's at pages 733

21   to '34 of the Appendix in his deposition testimony; at page

22   1328, where he —

23             THE COURT:  Okay.  And —

24             MR. HERRING:  Sorry.

25             THE COURT:  — all of these invoices are in the name of

*Plaintiff's Motion for Summary Judgment*                    26

1   Raheel.

2            MR. HERRING:  That's right, Your Honor.

3            THE COURT:  Okay.

4            MR. HERRING:  Raheel took the Fifth as to them.  And

5   Rozmeen also disavowed any knowledge of them.

6            THE COURT:  Okay.

7            MR. HERRING:  Okay, so.

8            THE COURT:  Okay.

9            MR. HERRING:  Okay.  So turning back to Section

10  727(a)(3), failure to maintain records, —

11           THE COURT:  Um-hum.

12           MR. HERRING:  — first we'd ask the Court to take

13  judicial notice of the debtor's deficient discovery responses

14  and other misconduct for which he's been sanctioned.

15           THE COURT:  Okay.

16           MR. HERRING:  Further, the debtor's own unbelievable

17  testimony reinforces Benefit Street's evidence of the debtor's

18  sophisticated finances, which he has failed to produce records

19  of.  Starting with financial accounts, in the schedules, the

20  debtor listed only two Bank of America accounts that had been

21  garnished and belatedly added a Goldman Sachs account.

22           Through third-party discovery, Benefit Street obtained

23  evidence that is uncontrovertible of many undisclosed accounts

24  for which the debtor has produced no records.  For instance, the

25  debtor, together with Raheel and Rozmeen, jointly held about 10

*Plaintiff's Motion for Summary Judgment*                    27

1    Goldman Sachs investment accounts that at times it had millions

2    of dollars in them.  But the debtor disavowed knowledge of those

3    accounts in his testimony.  He stated in his deposition that he

4    never worked with an investment advisor at Goldman.  That's in

5    the Appendix at page 691.  And he stated the same, even when

6    given those advisors' names and presented with emails sent to

7    him by those advisors later on in his deposition.  That's at

8    page 728.  And then the emails sent to him are at pages 1172 to

9    '73.

10           And more of the same denials even when presented with

11   a form which he admits having signed that claimed over $6

12   million in income and $450 million in assets.  That's in the

13   Appendix at page 729 to '30 and page 1174.

14           And I'll mention, Your Honor, we don't believe that

15   the family ever had $450 million in assets.  But we do believe

16   that the debtor was aware of the existence of these Goldman

17   accounts, based on his signature on the form for Goldman.

18           It isn't just the Goldman Sachs accounts, Your Honor.

19   The debtor also produced no records and never disclosed the

20   existence of a JPMorgan private client checking account with

21   between 9,- and $10 million in it, in his name, or another $10

22   million JPMorgan private client savings account.  Those

23   statements are at pages 1408 to '10 of the Appendix.

24           And the debtor never disclosed or produced any records

25   related to a Guaranty Bank investment account held jointly

*Plaintiff's Motion for Summary Judgment*                                   28

1    between him and Rozmeen worth $5 million at one point.  That's

2    in the Appendix at page 1411.

3            Next, the debtor failed, even upon request, to produce

4    any records for the family's various businesses, including the

5    following that he indisputably has or had an interest in:  RIBA

6    Hospitality Fund I, LLC, which owned the family's Hampton Inn.

7    The debtor listed no interest or any disposition of any interest

8    in RIBA.  That R-I-B-A, for the record.  But when it was formed,

9    the debtor was both its registered agent and manager.  That's in

10   the Appendix at page 1414.

11           On the signature card for the RIBA bank account, also

12   at Chase, he is listed as a member.  Appendix, at page 1301.

13   And a hotel employee, when deposed, described the debtor as,

14   quote:  Running everything, like he was, I guess, the

15   ringleader, the — the boss.  Appendix at 1547.

16           Despite overwhelming evidence that the debtor was

17   involved in the ownership and management of RIBA and the Hampton

18   Inn that it owned, in his deposition, the debtor flatly

19   disavowed any knowledge and minimized his role with the hotel.

20   That testimony is at page 695 and 735 of the Appendix.

21           IBA Properties, LLC, which is not the same as the

22   borrower under the loan, was another family business.  The

23   debtor again disavowed any knowledge of IBA and its operations,

24   and didn't schedule it.  But the debtor executed documents

25   authorizing the sale of property owned by IBA as its sole

*Plaintiff's Motion for Summary Judgment*                                        29

1    manager.  That's in the Appendix at 1416 to '18.  And, using a

2    Hilton — this is kind of ironic — using a Hilton email address

3    associated with the Hampton Inn, the debtor actively directed

4    and approved that transaction.  That's in the Appendix at 1447.

5          And, finally, the debtor disavowed any knowledge of or

6    any involvement in IBF Properties, the loan borrower, Appendix

7    at 696 or 703.  But we already know about the email traffic

8    related to the debtor's efforts to ensure that collateral

9    properties and also that the debtor was listed on the IBF

10   company website and in investor pitch materials as IBF's

11   managing director, president, and cofounder.  Those materials

12   and website are at pages 295 to '96 and page 302 of the

13   Appendix.

14         To keep going, the debtor also has failed to maintain

15   accurate tax records or to tell us what is accurate.  Benefit

16   Street has been presented with for certain years vastly

17   different tax returns, all apparently signed.  The Court can

18   compare the debtor's 2018 tax return, at Appendix 739 to '40,

19   which he provided, reflecting just $15,298 in income, with the

20   debtor's 2018 tax return at Appendix 745 to '46, which reflected

21   more than $3.7 million in total income.

22         Similarly, you can compare the debtor's 2019 tax

23   return at page 753 with the tax return at page 764, which shows

24   a similar delta in income.  And the debtor testified that he has

25   not filed tax returns from 2021 forward.  I believe the IRS'

*Plaintiff's Motion for Summary Judgment*                                    30

1    proof of claim in this case confirms that.

2           THE COURT:  I saw the 2018 and the 2019 tax return.

3    Did you say there is a 2021 in the summary judgment —

4           MR. HERRING:  No, Your Honor.

5           THE COURT:  Okay.

6           MR. HERRING:  And he has not filed from '21 forward,

7    as we understand it.

8           THE COURT:  Okay.  From '20 forward, okay.

9           MR. HERRING:  Right.  So we have two 2018 returns and

10   two 2019 returns.

11          THE COURT:  Got it, um-hum.

12          MR. HERRING:  To sum it up, the debtor's story about

13   his recordkeeping and the evidence assembled by Benefit Street

14   don't align in the slightest.  The debtor's story is that in the

15   years leading up to the bankruptcy filing, he was a

16   self-employed insurance agent with modest assets and modest

17   income.  Confronted with documentation to the contrary, which he

18   clearly knew existed but refused to produce, he's maintained

19   these falsehoods.

20          The debtor cannot offer no justification for his

21   failure to produce records and requires denial of his discharge.

22          Our fourth claim for relief is under Section

23   727(a)(4), for the debtor's false oaths.  Fraudulent intent and

24   connection with Section 727(a)(4) can be demonstrated either

25   under the *Chastant* factors or based on the debtor's reckless

*Plaintiff's Motion for Summary Judgment*                              31

1    disregard for making truthful disclosures.  Support for that

2    comes from the *Bren* case out of the Eighth Circuit BAP in 2004

3    and the *Chavin* case out of the Seventh Circuit in 1998.

4           As Judge Houser described it, the cumulative effect of

5    falsehoods in bankruptcy documents may evidence a pattern of

6    reckless and cavalier disregard for the truth to support

7    fraudulent intent.  And that is from the *Perez* case, 2007

8    Bankruptcy Lexis 3124 at Star 21, from this district, September

9    18th, 2007, citing to the *Sholdra* case, 249 F.3d 380, in the

10   Fifth Circuit.

11          The debtor's false statements in this case are myriad.

12   They include the numerous omissions of information about

13   financial accounts, business interests, inaccurate income

14   information that we just reviewed.  They also include

15   misinformation about the family's assets dating back to even

16   before the fraud against Benefit Street.  We talked about the

17   jewelry already and — and the debtor and his family's

18   unwillingness to discuss it at all.

19          The debtor also and pretty unconvincingly disavows any

20   knowledge of the family's luxury vehicles owned up until the

21   time they fled the country.  Among these were a Bentley Bentayga

22   SUV, a Range Rover, the debtor's Mercedes which he leased — and

23   he has undoc'ed (phonetic) to the Mercedes; there's nothing

24   necessarily problematic about that — and an Audi.  Raheel

25   purchased the Bentley and Range Rover at the same time, on

*Plaintiff's Motion for Summary Judgment*                                    32

1    December 24th, 2021, in the Appendix at pages 1199 and 1222, for

2    a total purchase price of about $382,000.  He paid with a check

3    drawn against an AccessBank account.  That's at page 1234.

4            THE COURT:  Against a what bank account?

5            MR. HERRING:  AccessBank, Your Honor.

6            THE COURT:  Access.

7            MR. HERRING:  Interestingly, and these are in sales

8    records that we obtained from the dealership where they

9    purchased the Bentley and Range Rover, copies of the debtor's

10   driver's license were in the sales paperwork.  The debtor even

11   confirmed it was his driver's license, at page 732 to '33 of his

12   deposition testimony.  So it seems obvious that the debtor was

13   with Raheel when he bought the cars, and he likely even test

14   drove them.  The debtor obstinately denies ever being there.

15   That's at page 733 of the Appendix.

16           Your Honor, this plus the jewelry, plus the financial

17   accounts, plus the other things that I'm losing track of, the

18   debtor has made no effort whatsoever to explain the

19   discrepancies.  For better or worse, the debtor has his story

20   and he's sticking to it, even in the face of overwhelming

21   evidence.

22           Your Honor, this establishes a reckless, at best,

23   disregard for the truth.  It establishes fraudulent intent.

24   These mistruths are myriad and material.  Summary judgment is

25   appropriate under 727(a)(4).

*Plaintiff's Motion for Summary Judgment*                    33

1        Finally, briefly, under Section 727(a)(5), the debtor

2   has failed to explain loss of assets to meet his liabilities.

3   The evidence and factual support for this is cumulative of

4   everything we've just discussed.  We've identified millions of

5   dollars in assets, apparent undisclosed income, about which the

6   debtor is completely silent.

7        Section 727(a)(5) requires no showing of intent, but

8   even if — even if it was required, we have it, and we believe

9   Benefit Street is entitled to judgment.

10       Your Honor, there's a sort of maxim, I think probably

11  in the case law too, that summary judgment is rarely appropriate

12  in litigation under Section 727, especially where there are

13  intent questions involved.  Here, however, there is an

14  overwhelming weight of evidence that the debtor sat atop and

15  played an intricate role in his family's remarkable misconduct.

16       To put it bluntly and sum it all up, the debtor and

17  his family got $150 million from Benefit Street — Street

18  fraudulently, took nearly $22 million of that money for

19  themselves, transferred and secreted those loan proceeds and

20  other assets through transactions, and fled the country to

21  escape the consequences.  Then the debtor returned but only

22  after he felt comfortable that he personally faced no criminal

23  liability and that he could use the bankruptcy system to escape

24  his own indebtedness to Benefit Street.  But to beat the drum

25  once again, bankruptcy relief is for honest people.  The debtor

*Plaintiff's Motion for Summary Judgment*                    34

1    is certainly not honest.  The evidence shows that dishonesty is

2    probably the debtor and his family's lifework.  And the record

3    of the case shows that the debtor continues to openly mock this

4    Court's authority and the integrity of the bankruptcy system.

5          We submit there are no genuine issues of material

6    fact, and summary judgment should be granted.  And if Your Honor

7    has additional questions, I welcome them.

8          THE COURT:  Not at this time.

9          MR. HERRING:  Thank you, Your Honor.

10         THE COURT:  Thank you.

11         Ms. Lindauer.

12         MS. LINDAUER:  Thank you, Your Honor.

13         I think Your Honor was focusing on a lot of the issues

14   that we were looking at as well, which is again I think what's

15   important here is to focus on what did Mr. Bhai actually do.  I

16   mean so there are five pointers.  One 523 complaint.  There's a

17   series of 727 complaints.  But, again, what his son did or his

18   wife did or other people may have done, they're not before this

19   Court and they're not in bankruptcy.  So Mr. Bhai is the one

20   that's before this Court and in bankruptcy.

21         First of all, I think the majority of the allegations

22   include two things the Court has to consider.  One is most of

23   the allegations include intent.  And it's hard to derive intent

24   from a series of documents.  And even the testimony counsel has

25   included negate the finding of intent because most of the

*Plaintiff's Motion for Summary Judgment*                    35

1   allegations say:  I didn't have anything to do with that, I

2   didn't know — so again it will rely a lot on the credibility of

3   how the Court views this witness.  And Mr. Bhai, you met his

4   son, but I don't think you've actually met Mr. Bhai, the father,

5   who is the subject of this litigation.

6           So, so one, it concerns me that so many of these

7   allegations do require an intent requirement, knowingly or

8   fraudulently, knowingly and fraudulently, whatever.  So that

9   being the case, I think it's hard to derive intent when you have

10  a series of documents, on one hand, and you have a deposition

11  saying, 'I don't know anything about that.'  You're going to

12  have to judge the credibility of the witness.

13          And why do I say that?  Because the trial setting in

14  this case is just a month from now.  It's in July.  So it's not

15  like we're having to wait a long time to get these issues

16  resolved.  I think the fact that the trial setting is July, the

17  week of July 15th, and that the pretrial is coming up also, that

18  tells me that I think the Court should be inclined to not grant

19  summary judgment, particularly on issues that do require you to

20  review what is actually going on here.

21          But I think the Court hit the nail on the head, and

22  I'm going to have Ms. Ollar pull up some of these documents that

23  you may have already looked at, but, for example, going through

24  the documents that they reference, starting with the loan

25  agreement.  Of course Mr. Ismail Bhai had nothing to do with the

*Plaintiff's Motion for Summary Judgment*                36

1    signing of the loan agreement.  We can go to that.

2         That's Exhibit A, Sydney, if you want to pull that up.

3      (Counsel confer off record.)

4         MS. LINDAUER:  Okay.  The page number on that would be

5    — and I'm going with their reference — 121.  There you go.

6         So that's the original loan agreement and that's what

7    starts the basic disagreement between IBF Properties, as the

8    borrower, and BSRPT [sic] CRE Finance, LLC, the lender.

9         If you go down to the signature pages on that

10   document, at the very end.  There you go.

11        So IBF Properties, the Texas — Texas limited liability

12   company, by IBF Properties WAL Group I, LLC, managing member,

13   Raheel Bhai.  And that becomes important because IBF Properties,

14   IBF Properties WAL Group I, LLC, you're not going to see Ismail

15   Bhai's signature or name associated with those entities.

16   They're Raheel Bhai's entities.

17        The same thing would hold true for the promissory

18   note.  That's Exhibit B.  That's at page 283.

19        And then if we drop to the next document that I think

20   is important, is the forbearance agreement.

21        THE COURT:  Let me — let me stop you —

22        MS. LINDAUER:  Sure.

23        THE COURT:  — right there.  As you could glean from my

24   questions, I have zeroed in on the fact that —

25        MS. LINDAUER:  Yeah.

*Plaintiff's Motion for Summary Judgment*                    37

1    THE COURT: — it was Raheel who signed the loan

2    agreement, it was Raheel who signed the promissory notes.  But I

3    do have summary judgment evidence that I don't think you've

4    refuted, your client has refuted, that IBF — you know, there's —

5    there are marketing materials out there that show the debtor is

6    a co-founder and president and managing director.  And then

7    there are emails and summary judgment evidence showing he was in

8    the loop with some of the lender discussions about getting

9    insurance.

10    MS. LINDAUER:  Sure.

11    THE COURT:  So it's —

12    MS. LINDAUER:  So —

13    THE COURT:  Mr. Herring is saying I could make an

14    inference from the unrefuted summary judgment evidence that the

15    debtor was very much in the loop about this loan.

16    MS. LINDAUER:  Yeah.  I don't think that that's

17    unrefuted summary judgment evidence.  So I think if you go to

18    our response to the motion for summary judgment, particularly —

19    I know what you're talking about — Exhibit B.

20    If you want to pull that up, Sydney, that's page 297.

21    That's the slides regarding IBF Holdings.

22    THE COURT:  Um-hum.

23    MS. LINDAUER:  Right.  So, first of all, there's no

24    testimony before you who prepared this slide show and if, in

25    fact, Mr. Ismail Bhai had anything to do with it.

*Plaintiff's Motion for Summary Judgment*                                    38

1          And you can scan down, Sydney.  Go down a couple

2    pages.

3          And, in fact, I think his testimony was pretty clear

4    that he didn't know anything about this slide show and he did

5    not provide any of the information —

6          THE COURT:  That's in the summary judgment evidence.

7    It's definition testimony regarding the slide deck and —

8          MS. LINDAUER:  No.  I think — I don't think they

9    referenced it in the depositions.  But in our response, which

10   was verified with — with a declaration, we denied having any

11   knowledge or involvement in preparing this website.

12         THE COURT:  Okay.

13         MS. LINDAUER:  So —

14         THE COURT:  It — point that out —

15         MS. LINDAUER:  Okay.

16         THE COURT:  — and then we're going to talk about it a

17   little more.

18         MS. LINDAUER:  Okay.

19         THE COURT:  Where is the specific —

20         MS. LINDAUER:  Okay, so let's find the specific

21   allegation.  Okay, hang on.

22         THE COURT:  Okay.  Maybe paragraph 50.

23         MS. LINDAUER:  Pick up —

24         THE COURT:  Of your response.

25         MS. LINDAUER:  Right.  Also I think paragraph — start

*Plaintiff's Motion for Summary Judgment*                              39

1    with paragraph 8:  Defendant admits the allegation in paragraph

2    8 to the extent Raheel Bhai's ownership of IBF but denies the

3    allegation that defendant jointly owned and controlled it with

4    his son.  At such — as such, this is a disputed fact question.

5              That's paragraph —

6              THE COURT:  Okay.  Let me ask you a very —

7              MS. LINDAUER:  Sure.

8              THE COURT:  — pointed summary judgment question.  Is

9    it really —

10             MS. LINDAUER:  Sure.

11             THE COURT:  — enough to simply have a one- or

12   two-paragraph affidavit of the debtor saying, 'I adopt

13   everything in the pleading, the response'?

14             MS. LINDAUER:  'As my sworn testimony'?

15             THE COURT:  Yeah.  I mean the case law says you have

16   to go beyond the pleadings —

17             MS. LINDAUER:  Right.

18             THE COURT:  — and be more specific, doesn't it?

19             MS. LINDAUER:  Well, —

20             THE COURT:  To create a fact issue.  You can't just

21   throw a metaphysical doubt out there, to use the U.S. Supreme

22   Court's words?  I mean is this really enough?

23             MS. LINDAUER:  Your Honor, —

24             THE COURT:  Fifteen hundred pages versus a

25   one-paragraph 'I adopt everything in the pleading my lawyer

*Plaintiff's Motion for Summary Judgment*                                    40

1   filed.'

2          MS. LINDAUER:  Well, but the pleading 'my lawyer

3   filed' was how many pages?  The pleading that 'my lawyer filed'

4   was 18 pages.  So it wasn't a two-page —

5          THE COURT:  Well, — okay.  Well, I shouldn't have

6   mentioned page numbers, because that was misleading.  I'm just

7   saying I have not one piece of summary judgment evidence from

8   you except a declaration saying, 'I adopt my counsel's

9   response.'  I'm sure procedurally that is sufficient in a

10  summary judgment context.

11         MS. LINDAUER:  Okay.  But — okay.  But let's turn it

12  the other way.  Is including a website where there is no proof

13  that my client had anything to do with preparing that website,

14  posting that website, or providing the information that's in

15  that website to just copy something off of the internet and say,

16  'Look, it mentions his name,' is that —

17         THE COURT:  Well, —

18         MS. LINDAUER:  — enough?

19         THE COURT:  — he's thrown it out there.  And then —

20         MS. LINDAUER:  Right.

21         THE COURT:  — you rebut it with something.

22         MS. LINDAUER:  Right.  And I said —

23         THE COURT:  And I'm not sure I haven't —

24         MS. LINDAUER:  — we — and I said we deny the

25  information, obviously, presented in that website, right?  So

*Plaintiff's Motion for Summary Judgment*                    41

1  other than — and there was no deposition taken that said this

2  was my website or I agree with the information provided in the

3  website.  So, again, you know, I would argue that that is

4  sufficient to — again, they have the burden.  They've got — by a

5  preponderance of the evidence, they've got to convince you that

6  that website —

7          THE COURT:  Well, it's not preponderance of the

8  evidence.  It's they have to show there is no material fact —

9          MS. LINDAUER:  Fact issue.

10         THE COURT:  — in dispute.

11         MS. LINDAUER:  Right.

12         THE COURT:  And —

13         MS. LINDAUER:  And we have raised —

14         THE COURT:  — and so they put something out there,

15 1500 pages, and it's up to you to go beyond the pleadings,

16 saying:  There's a material fact issue here.

17         MS. LINDAUER:  Right.

18         THE COURT:  And I'm not sure — again, that was the

19 basis for my question.

20         MS. LINDAUER:  Okay.

21         THE COURT:  The Supreme Court says you have to create

22 — create more than a metaphysical doubt.  If all you have is a

23 pleading admitting and denying and, you know, throwing a few —

24         MS. LINDAUER:  Right.

25         THE COURT:  — extra statements out there, and then a

*Plaintiff's Motion for Summary Judgment*                                    42

1   one-paragraph 'I accept this as my sworn testimony,' I just

2   don't know procedurally if that's enough.

3          MS. LINDAUER:  Right.

4          THE COURT:  I'm scratching my head over that.

5          MS. LINDAUER:  Well, but again wouldn't the best proof

6   of the ownership of IBF be the corporate documents showing the

7   ownership of IBF versus a website that just merely mentions my

8   client as one of the possible owners, directors, officers,

9   managers, whatever, without any information as to who created

10  the website?

11         THE COURT:  I — I agree that —

12         MS. LINDAUER:  Yes.

13         THE COURT:  — we would absolutely have to go to trial

14  if we had that, —

15         MS. LINDAUER:  Right.

16         THE COURT:  — but I don't.  And so I —

17         MS. LINDAUER:  Well, but, Your Honor, that's the way

18  we approached — if you will recall, we did ask for an extension

19  to file our response.  The other side opposed that.  So we filed

20  our response.

21         THE COURT:  Okay.  I don't recall that.

22         MS. LINDAUER:  So — it's on the docket.

23         THE COURT:  It — okay.  It may be on the docket, but I

24  just —

25         MS. LINDAUER:  It's on the docket, Your Honor.

*Plaintiff's Motion for Summary Judgment*                    43

1          THE COURT:  Okay.

2          MS. LINDAUER:  We asked for an extension, because we

3    got an 1800-page appendix.  And we did ask for an extension.

4    They opposed that.  And rather run the risk of not filing a

5    response, we filed a response.

6          Now we still have an extension on file with you.

7    That's never been withdrawn.  It's still out there.  So if you

8    think that the evidence we have presented, when I think is not

9    sufficient, then I do think I should have an opportunity to

10   provide perhaps a affidavit in greater detail.  But, again, all

11   it's going to say is exactly what our response says, which is —

12   denies that jointly owned and controlled it.  So I mean it's

13   going to be exactly the same as — as what's in the response

14   itself, which is adopted in the declaration.

15         THE COURT:  Okay.

16         MS. LINDAUER:  Okay.  I understand your position, Your

17   Honor.  My — my point being that the bulk of the documents they

18   have provided to you don't support their claims, and that's

19   what's troubling.  And you've got 1800 pages of an appendix that

20   don't support their claims.

21         So, for example, my client had nothing to do with the

22   loan agreement; nothing to do with the promissory notes.

23   Frankly, no proof that he had anything to do with the website

24   other than his name appears on there, but there's no evidence

25   that he had anything to do with the website, any input into the

1   website or participated in the website, or the slides that were

2   provided.

3          He didn't sign the guaranty that was signed by Raheel

4   Bhai.  Didn't sign the guaranty that was signed by Rozmeen Bhai.

5   The only guaranty he did sign was Exhibit I, which is a guaranty

6   of the forbearance agreement, not the original document.

7          What's even more troubling is they do go get a

8   judgment.  They got a state court judgment, Exhibit M.  If you

9   look at Exhibit M.

10          If you will pull that up, Sydney — that's 504.  And

11  the actual judgment is 548.

12          Here is the judgment that they got, which was

13  obviously final judgment.  It was a default judgment.

14          If you scroll down.

15          The judgment they took against Mr. Ismail Bhai.  If

16  you run up again, of course there is no finding of fraud,

17  misrepresentation, or any wrongdoing as against Mr. Ismail Bhai.

18          If you will drop down again, Sydney.  Next page.

19          And if you look, there is a Raheel Bhai exemplary

20  damages against him that appears in paragraph d.  If that's your

21  postjudgment, exemplary damages in the amount of — with

22  postjudgment.  So, again, no exemplary damages against Ismail

23  Bhai.  And, frankly, no findings in that judgment whatsoever of

24  any wrongdoing.  That's where you would normally find a 523

25  complaint, if one exists, and you were seeking some sort of

*Plaintiff's Motion for Summary Judgment*                              45

1    judgment on that 523 complaint.

2            Perfectly honest, there is no evidence in this record

3    that Ismail Bhai did anything under 523 that would amount to

4    false pretenses, false representations, or actual fraud.  What

5    they want you to do is impute the wrongdoing of Raheel Bhai to

6    Ismail Bhai.

7            THE COURT:  Let me — let me stop you —

8            MS. LINDAUER:  Sure.

9            THE COURT:  — on one thing.  The guaranty, which —

10           MS. LINDAUER:  Is Exhibit —

11           THE COURT:  Well, I —

12           MS. LINDAUER:  — 478 —

13           THE COURT:  Yes.

14           MS. LINDAUER:  — page 478.

15           THE COURT:  And I do read it to be a guaranty of all

16   obligations.

17           MS. LINDAUER:  Okay.

18           THE COURT:  And I'm looking at 1.2.  I don't think it

19   — you said a guaranty of the forbearance agreement amounts —

20           MS. LINDAUER:  Well, it was signed — I'm sorry.  You

21   know, correct me, but it was signed at the same time that the

22   forbearance agreement was signed.

23           THE COURT:  Yes, yes.

24           MS. LINDAUER:  Right.

25           THE COURT:  I read that, I understood that.  But —

*Plaintiff's Motion for Summary Judgment*                                46

1          MS. LINDAUER:  So — but, again, if your false

2   representation befalls actual fraud, that's at the time that you

3   take out a loan —

4          THE COURT:  Well, —

5          MS. LINDAUER:  So, but again, —

6          THE COURT:  — and I'm getting to my —

7          MS. LINDAUER:  Right.

8          THE COURT:  — my question.

9          MS. LINDAUER:  If you can pull that up, Sydney, 475.

10         THE COURT:  If you look at page 485, paragraph 3.4.

11         MS. LINDAUER:  Okay.

12         THE COURT:  Here is something I got concerned about —

13         MS. LINDAUER:  Okay.

14         THE COURT:  — in preparing for today:  Guarantor's

15   financial condition.  As of the date hereof, and after giving

16   effect to the guaranty and the contingent obligation evidence

17   hereby, guarantor is and will be solvent and has and will have

18   assets, which, fairly valued, exceed its obligations,

19   liabilities, including contingent liabilities and debts, and has

20   and will have property and assets sufficient to satisfy and

21   repay its obligations and liabilities, including the guaranteed

22   obligations.

23         I think — I think it is woven in the lengthy complaint

24   and motion that this might have been a misrepresentation on —

25   definitely on behalf of Ismail as opposed to Raheel.

*Plaintiff's Motion for Summary Judgment*                                    47

1      MS. LINDAUER:  So if you go to 523(a)(2)(A), it says:

2  Money, property, or services, or refinancing to the extent

3  obtained by false pretenses, false representation — other than a

4  statement respecting the debtor's or an insider's financial

5  condition.

6          So if you're — I don't know how you read that, but the

7  way I read it is if it's a statement regarding the debtor-

8  insider's financial condition, then that's an exception to the

9  false pretenses, false, or actual fraud.

10         So, look, there is no dispute —

11         THE COURT:  No, no, no, no, no.

12         MS. LINDAUER:  Okay, well, then how do you read that —

13         THE COURT:  Well, but go — well, try 523 —

14         MS. LINDAUER:  (a)?

15         THE COURT:  (2).

16         MS. LINDAUER:  (A)?  Not (B).

17         THE COURT:  Oh, so you're saying because they didn't

18  see (B)?

19         MS. LINDAUER:  (B), correct.

20         THE COURT:  523(a)(2)(B)?

21         MS. LINDAUER:  Right.

22         THE COURT:  That which is established on that.

23         MS. LINDAUER:  Yeah.  Because — because obviously that

24  would be a statement regarding the debtor's financial condition

25  that he had sufficient — plus, again, you have to go back and

*Plaintiff's Motion for Summary Judgment*                                    48

1    also read — their only 523 complaint is 523(a)(2)(A), period,

2    okay?  So you have to find there is some kind of false

3    pretenses, false representation, or actual fraud, full stop,

4    okay.

5            So, again, let's be real clear here.  If you read the

6    deposition transcript of Ismail Bhai, he's going to tell you

7    that he went over to Nelson Mullins' office.  They presented him

8    with a stack of documents.  He had no lawyer present.  He was

9    instructed by various persons to sign those documents, and he

10   did.  Okay.  But clearly this provision would be one regarding

11   financial condition.  And clearly everyone knew that he didn't

12   have the — $155 million.  I mean they're just — where would he

13   have had that money?

14           Because looking at the closing statement.  They didn't

15   walk away with $155 million.  So, again, — but so, Your Honor, I

16   would argue that — that that is not part of what they pled for

17   and that they don't have facts to show that at the time of the

18   execution of the loan agreement, the guarantor — the guaranty

19   agreement, or forbearance agreement, that there was any actual

20   fraud.

21           I question whether there was even any consideration

22   given to Ismail to sign that, because, frankly, he wasn't a

23   borrower on the debt.  But he agreed to sign this to support, I

24   guess, his son or the business, so, anyway, yeah.

25           So I real feel like that that — the 523, you can take

*Plaintiff's Motion for Summary Judgment*                                   49

1    it up at the time of trial, but I don't think there's evidence

2    to support a summary judgment on a finding of fraud.

3            THE COURT:  Okay.

4            MS. LINDAUER:  Going through the 727 elements, the

5    problem that you run into each of those too, for in large part,

6    if you look at each one of those, there has to be a showing of

7    some sort of intent.  So, for example, if you look at 727(a)(2):

8    The debtor, with intent to hinder, delay, or defraud a creditor,

9    or an officer of the estate charged with — has transferred,

10   removed, destroyed within one year before the date of filing or

11   after the date of filing.  So this, you got to be careful about,

12   because if you look at their exhibits, a lot of their exhibits

13   are 2020 and 2021.  Now it's one year before and after, right,

14   that's the test under that provision.  So you got to look at the

15   time periods that they're complaining about.

16           And the reason I mention that is because if you look

17   at some of these bank statements that they're having you rely

18   on, some of those go back earlier than the one year before the

19   filing of the bankruptcy.  They're much — they're an earlier

20   period of time than that.  And so I think you have to look at

21   what they have actually given you.  And I was going to try to

22   grab one of those real quick and show you, but you can look at

23   them.  But, again, you have to look at the operative period of

24   time that we're talking about.

25           And we have to look at — and, again, when you get into

*Plaintiff's Motion for Summary Judgment*                                    50

1    these intent issues, I feel like you have to try that issue

2    because you got to judge the credibility of these witnesses.

3          You may think he's not a credible witness.  I don't

4    know.  But, again, these are heavy fact questions about whether

5    there is a fact issue here or not.

6          Let me jump to the next one.  The tax returns.  Let me

7    — let me just show you somewhere of these.  These are — these

8    are troubling at best.  But I mean if we look at, for example,

9    739.

10         If you can pull that one up, Sydney.

11         Okay.  So these are the — this is the tax return that

12   shows how much money Mr. Bhai made in 2018.  If you drop —

13         THE COURT:  And this is dated August 29th?

14         MS. LINDAUER:  I don't read that.

15         THE COURT:  Of 2023?

16         MS. LINDAUER:  Your guess is as good as mine, Your

17   Honor, on what the date on that is.  I can't tell.  Or is it

18   2020?

19         THE COURT:  I don't know, but it's the second one.  He

20   filed an earlier one —

21         MS. LINDAUER:  Okay, so look at that one.  Then look —

22   okay, so let's scan down on this one, Sydney, a little bit.

23         And the other thing you have to read in his

24   depositions is — is he will tell you throughout his deposition

25   that some of these things are things he did not prepare and he

*Plaintiff's Motion for Summary Judgment*                    51

1    did not sign.  Okay.  So let me give you an example.

2              Go back up a little, Sydney, on that one.

3              Look at the signature on — okay, right there — on this

4    one, on this tax return, okay?  Keep that in mind.

5              Okay, go to the next 2018 tax return.  That's 745.

6    There you go.

7              Okay, 2018 tax return.  Now look at the signature on

8    this one.  And if you put those signatures next to each other,

9    you're going to get a lot of testimony, and this is in their

10   record they designated where he says, 'I'm not familiar with

11   these documents and that's not my signature.'  And you can tell

12   looking, comparing those signatures that they don't look

13   similar.

14             This one is dated 2/18 of '18, okay.

15             THE COURT:  Yeah, before the tax year.

16             MS. LINDAUER:  I know, I know.  So that's what I'm

17   saying.

18             This — okay, but drop on down.  Go ahead.  Go ahead

19   drop down.

20             But this one is even more troubling, because he

21   claims, first of all, it's a forgery.

22             But keep going.  Go on down.

23             This is the one that has the big dollars in it.

24             But keep going.  Okay, stop there.  And go back,

25   Sydney.

*Plaintiff's Motion for Summary Judgment*                                    52

1          Okay.  So we have income or losses from partnerships.

2    HKS and Managers I, Limited Cross, you probably haven't seen

3    that name anywhere else.  RK Hospitality Magnus and Hotels.  HC

4    Dallas, LLC.  And then:  See schedule attached.  Okay.  Mr.

5    Ismail Bhai never owned an interest in any of these businesses.

6          THE COURT:  And do I have his sworn testimony to that

7    effect?

8          MS. LINDAUER:  He — you — well, I don't know if it

9    identifies these businesses, but you're going to have his

10   deposition testimony where he's going to tell you he doesn't

11   know anything about this tax return.  You do have that —

12         THE COURT:  Do I have that?

13         MS. LINDAUER:  You have —

14         THE COURT:  His deposition testimony in this —

15         MS. LINDAUER:  Yes.

16         THE COURT:  — 1600 pages, or whatever it is —

17         MS. LINDAUER:  You do, Your Honor.  You have his

18   deposition testimony.

19         And then drop down, Sydney, if you can.  And let's

20   take a look — okay, let's go to — go to the 2019.  That's 753.

21   Go back up.

22         THE COURT:  So he basically says:  Someone committed

23   identity fraud on me and filed tax returns —

24         MS. LINDAUER:  He basically says —

25         THE COURT:  — that —

*Plaintiff's Motion for Summary Judgment*                                    53

1          MS. LINDAUER:  — he doesn't know anything about these

2    tax returns, and that's not his signatures on these tax returns,

3    is what he's going to tell you.

4          Okay, so go to 2019.

5          So this is the tax return for 2019.  Again, you know,

6    modest amount of income here.

7          Okay, keep going.  Okay.

8          And, let's remember, these are the tax returns that

9    Benefit Street would have had potentially when he signed

10   forbearance agreement guaranties, when they signed those

11   documents, twenty eight — 2019, right?  So —

12         THE COURT:  Yeah, how do I know that?

13         MS. LINDAUER:  I'm sorry?

14         THE COURT:  How do I know that?

15         MS. LINDAUER:  Well, I mean they have them now.  I

16   don't know when they got them, but —

17         THE COURT:  I know they had them back then.

18         MS. LINDAUER:  — they have — they clearly have them

19   now, but — okay, go on down.

20         But what I'm saying is there is no reason for them to

21   believe that his financial condition was anything different than

22   what's showing up here.

23         Go to the next one.  Go to the 2019, 761 —

24         THE COURT:  It's their fault — it's their fault they

25   lent the company money —

*Plaintiff's Motion for Summary Judgment*                    54

1        MS. LINDAUER:  No.  But, remember, they didn't loan

2   the money to him.  So, you know, again, let's keep — we're

3   talking about somebody that joined in the fight here, probably

4   wrongfully.

5        But, anyway, keep going, Sydney.  Go to the next one.

6   The 20- — keep going.  You have to go onto another page.

7   They're out — the pages are a bit out of order here.

8        Okay.  This is another one that's got the big numbers

9   on it.  Okay, but let's stop here.

10       Okay.  So on the 2019, here are all the businesses

11  apparently he has some kind of interest in.  RK Hospitality, LLB

12  Milwaukee, HC Dallas, Supreme Bright.  Hospitality Leo,

13  Hospitality Northwest Airport, so on and so forth.  And he's

14  going to tell you that he doesn't know anything about these tax

15  returns.  And that's pretty accurate, looking at that.

16       Go back — go back and look at his signature too.  I

17  think you will see the signature page doesn't track with

18  anything that you have seen before.

19       There you go.  I think this is actually — this — so

20  these are out of order.  I think that's the signature page from

21  a different return.  You might have to go down further, Sydney.

22  Some of these pages are out of order.

23       But — but what I'm trying to show you, Judge, is that

24  — is that the evidence you have in front of you, first of all,

25  it's contradictory; but, second of all, frankly, it doesn't make

*Plaintiff's Motion for Summary Judgment*                          55

1   any sense.  And if you mesh that with his deposition testimony,

2   he will tell you that he didn't sign these and these were not

3   his tax — the first ones were.  But not these — these ones with

4   these ginormous — ginormous amounts.

5        And — and, frankly, Benefit Street Partners isn't

6   complaining that he failed to list all of those businesses in

7   his bankruptcy, which the lookback is four years.  So the 2019

8   businesses should have been in his bankruptcy.  Well, — and,

9   again, — okay, here's his signature on the — you can tell that's

10  a different signature.  That — this is the 2019 Ismail Bhai.

11  And — and you can see that that's — that's a different signature

12  than the one that you've seen before.

13       Let me jump, because —

14       THE COURT:  Are we going to have a handwriting expert

15  if we have a trial on this?  I mean I just — maybe I should have

16  gleaned from the massive paper I read that I had no idea there

17  was going to be an issue raised about the validity of a 2018 and

18  2019 tax return in the summary judgment record.

19       MS. LINDAUER:  Well, I mean I think that the evidence

20  before you, if you read the deposition transcript and you look

21  at the exhibits, clearly he testifies in his deposition, because

22  he did give his deposition for about five hours, he does testify

23  that —

24       THE COURT:  Okay.

25       MS. LINDAUER:  — that — yeah.  So —

*Plaintiff's Motion for Summary Judgment*                                    56

1          THE COURT:  So I have five hours of deposition

2    testimony in there?

3          MS. LINDAUER:  From Mr. Bhai, yeah, you do.

4          THE COURT:  Okay.  Well, you know what the Fifth

5    Circuit says, right?

6          MS. LINDAUER:  Yeah.

7          THE COURT:  The trial judge should not have to shift

8    through a giant summary judgment record to find tidbits that

9    are, you know, relevant and dispositive —

10         MS. LINDAUER:  I know.

11         THE COURT:  You need to point out in your papers what

12   I need to focus on.

13         MS. LINDAUER:  Well, I can point out what I think you

14   should focus on.  But, again, I'm not the movant on this, so it

15   would have been helpful — and now you know why I asked for an

16   extension, because, again, 1800 pages of an appendix is a little

17   overwhelming, right?  Let —

18         THE COURT:  You know it happens to me all the time,

19   okay, so I would not have immediately — it's just welcome to my

20   world.  Anyway, —

21         MS. LINDAUER:  Okay.  All right.  Let's — I'd like to

22   take a look at a few other documents, though, because I think,

23   again, these go to some of what you're looking at here.  For

24   example, — and you've hit on it, I think, on the vehicle

25   records.  The vehicle records, those appear — we'll get to

*Plaintiff's Motion for Summary Judgment*                                57

1    those.  Let me find those for you.

2           You also have Rozmeen's deposition as well.  And —

3    and, well, and of course Ray.

4           Let me see, let me find the vehicle records.  Those

5    are... That is on page... Let's see.  I think that's... Find

6    it.  Okay, here we go.

7           Take a look at — well, it — you already went over the

8    jewelry.  I think you — you under — followed the jewelry not

9    being in Mr. Ismail Bhai's name.  Let's go to the vehicles.

10          The vehicles start on — that would be like 1174 —

11   actually, let's start with the 1192.  Okay, so starting with the

12   vehicles, like on 1192, this is for the Land Rover that was

13   purchased — if you drop down a little bit, you're going to see

14   the customer's name on all of the vehicles — go on down a little

15   bit further, Sydney — are going to be under Ray Bhai.  None of

16   them were under Ismail Bhai.  So keep going.

17          Okay, you can — you can actually, I guess, go to the —

18   there you go.  There's one there.  Okay, so stop right there.

19          So you will see Ray Bhai and — and you will see Ray

20   Bhai, 2017 Land Rover, Range Rover sales price, et cetera.  And

21   obviously signed off on by Ray Bhai, 12/24 of '21.

22          Drop on down further.

23          THE COURT:  Should I care about "Customer did not pay

24   for product" up above?

25          MS. LINDAUER:  Where?  On that page?

*Plaintiff's Motion for Summary Judgment*                        58

1        THE COURT:  Um-hum.

2        MS. LINDAUER:  I think — well, that just means that he

3   didn't pay for, I guess, it was tires and wheels, or whatever

4   they were doing —

5        THE COURT:  Okay.  Okay.

6        MS. LINDAUER:  I don't think so.

7        Keep on going down.  Okay, oh, go back up.

8        And — and really what I'm just trying to show you is

9   that all the way through here, again like this is retail

10  purchase agreement, Raheel Bhai.

11       And there is a little confusion because it's Raheel

12  Ismail Bhai, so you have to look at the whole name, because

13  sometimes it's a little hard to follow the whole name, but — but

14  you can see here it's Raheel I. Bhai.  So his full name is

15  Raheel Ismail Bhai.  But I can't — go on down further.

16       But I'll represent to the Court that none of the

17  vehicles, not a one, are under the name of Ismail Bhai.  None of

18  the jewelry is under the name of Ismail — Ismail Bhai.

19       Now let's talk about the bank accounts.  And you do

20  have the deposition transcripts.  Those are all before the

21  Court.  And — but if you drop on down to the bank accounts, so,

22  for example, take a look at 1368.  Okay, so this is the EPI

23  Commercial, LLC account.  And if we drop on down on that

24  account, that's the one that had the $21 million in it.  And

25  this is the account that the 215065 was — was taken out of.

*Plaintiff's Motion for Summary Judgment*                    59

1          Go on down.  Okay.

2          And now we're to a different account which is a Bank

3   of America account.

4          So go back up to EPI.

5          What you don't have is you don't have anything that

6   shows who actually transferred the $21 million out of that

7   account and you don't have anything that shows that Ismail Bhai

8   has any particular relationship to the funds that were removed

9   from that account.

10         Now go on down.  What —

11         THE COURT:  His name is shown on the account.

12         MS. LINDAUER:  Not on this one, not on EPI.  His name

13  is on the next account.

14         Go to the next one.

15         And what the testimony is going to tell you on that

16  account —

17         THE COURT:  It's right there.

18         MS. LINDAUER:  Right, right.  But what he's going to

19  tell you is that him and his wife were accommodation to their

20  son Raheel on that account.  And that they had nothing to do

21  with any of the money — I'm just — that's the testimony —

22         THE COURT:  I don't know what that means,

23  accommodation to the son, who's —

24         MS. LINDAUER:  Well, because these are the — these are

25  the parents.  So like if Raheel were to die, then they're on

*Plaintiff's Motion for Summary Judgment*                          60

1   that account.  It'd be like if you had an account that you had —

2         THE COURT:  It's a —

3         MS. LINDAUER:  Yeah.

4         THE COURT:  The debtor has a property interest in the

5   account.

6         MS. LINDAUER:  Well, he may.  Again, you have to have

7   the account information to determine what interest, if any, he

8   has on that, right?

9         THE COURT:  His name is on it.

10         MS. LINDAUER:  I know, but is that a right of

11   survivorship, is that an actual right to the account?  We don't

12   have enough information here —

13         THE COURT:  His name is on the account.

14         MS. LINDAUER:  Right.

15         THE COURT:  I mean if you want to put, you know,

16   estate-planning documents that say it doesn't matter, why is

17   that — I mean I have no summary judgment other than an account

18   statement with his name on it.

19         MS. LINDAUER:  Right, right.  But what are they asking

20   you to grant them a summary judgment on as it relates to that

21   issue?

22         THE COURT:  Well, you know among other things, that he

23   didn't list all the bank accounts —

24         MS. LINDAUER:  Okay.

25         THE COURT:  — on his schedules or —

*Plaintiff's Motion for Summary Judgment*                           61

1          MS. LINDAUER:  Well, — well, —

2          THE COURT:  — for 727 purposes —

3          MS. LINDAUER:  Okay, so — okay.  So let's go back and

4     look at his schedules for just a second.

5          THE COURT:  Plus he —

6          MS. LINDAUER:  Okay, so hang on.

7          THE COURT:  It goes to some of their 523.

8          MS. LINDAUER:  Well, I don't — well, I don't think

9     it's a 523 issue.

10          THE COURT:  Well, okay, just take on 727.

11          MS. LINDAUER:  Okay.  727, so let's go back and look

12     at the schedules.  So that's — that's page 11, starting at 11.

13          THE COURT:  She's going to pull them up.  I haven't —

14          MS. LINDAUER:  Yeah, she's going to pull them up

15     because it's too hard to flip through the papers.

16          Okay, so go on down.  Okay, so go back to the first

17     part of page 11, Sydney, which will be the beginning of the

18     schedules.  Okay, you're on total claim, so let's go to

19     Schedules A and B.  Okay, so there's his house.  Hang on.  And

20     keep going.  I think you may be on the summary sheet.  Okay,

21     keep going down.  Okay.  Okay, run down.  Keep going.  There you

22     go.  Okay, hang on.  Okay.

23          He has — "Do you have other property of any kind not

24     already listed?"

25          "Debtor is a nonmanager of RIBA Hospitality and a

*Plaintiff's Motion for Summary Judgment*                                    62

1  signatory on its bank account at Guaranty Bank.  Debtor is also

2  a nonowner signatory of two bank brokerage accounts, garnish,

3  Goldman Sachs and Bank of America."

4         So, again, not a perfect disclosure, but there is a

5  disclosure.  We were looking at — what we were looking at right

6  there was the Bank of America account.  And he does acknowledge

7  that he is at least a signatory on the Bank of America account

8  and the Goldman Sachs account.  You heard something about that

9  as well.

10        So is that an ideal disclosure?  Probably not, but it

11 is a disclosure of his relationship to those two accounts.  When

12 he was asked about it in his deposition, he — he will tell you

13 more about the fact that he didn't have anything to do — other

14 than him being listed as a signer, that he didn't have anything

15 to do with the money moving in and out of those accounts.  But

16 he did disclose his relationship to those — those accounts.  And

17 those are Bank of —

18        THE COURT:  Okay.  The summary judgment evidence

19 showing he was the, quote, originator on two and a half million

20 dollars going out of the Bank of America account —

21        MS. LINDAUER:  Okay.  So let's — let's look at that

22 exhibit.  I think that's the one that's really dark and heard to

23 see.

24        THE COURT:  It is dark and hard to see.

25        MS. LINDAUER:  Let's see, yeah.

*Plaintiff's Motion for Summary Judgment*                                    63

1              THE COURT:  But I eventually —

2              MS. LINDAUER:  Let's see, that's Exhibit...

3              THE COURT:  I thought I tabbed it.

4              MS. LINDAUER:  That may be — is the wire transfer

5    advice?  That's 1115, I believe.  See if you can pull it up.

6    There it is.  So what that says is that's just the names on the

7    account.  You've got Ismail Essa Bhai, Rozmeen — Rozmeen Essa

8    Bhai.  Both of their names on there.  That's the Bank of America

9    account that you're referencing.  Right?

10             You're saying the originator Ismail Essa Bhai right

11   there as the originator —

12             THE COURT:  Yes.

13             MS. LINDAUER:  — on that.  And I think he, if you read

14   his deposition, will tell you that he didn't have anything to do

15   with that transfer.  So, again, you're — we're having to re- —

16             THE COURT:  The bank got it wrong.

17             MS. LINDAUER:  Yeah.

18             THE COURT:  The bank got it wrong —

19             MS. LINDAUER:  Well, you have to read — you have to

20   read into that document what was going on.  He was asked about

21   these documents and said that he didn't — and, again, his son,

22   which counsel acknowledged has said takes full responsibility

23   for what was going in and out of these accounts.  So, again,

24   that — but — and so I mean — and also I think what becomes

25   important here is dates, dates of the various transactions that

*Plaintiff's Motion for Summary Judgment*                                      64

1    were occurring here and — and who was related to those.  But,

2    again, —

3              THE COURT:  What do you — what do you mean by that?

4    The date was 7/18/22.

5              MS. LINDAUER:  Okay, so —

6              THE COURT:  Right after they signed the —

7              MS. LINDAUER:  But it —

8              THE COURT:  — the guaranty and the forbearance

9    agreement, right?

10             MS. LINDAUER:  Right.  But —

11             THE COURT:  We wrote mispaid assets, and here goes

12   $2.5 million.

13             MS. LINDAUER:  Well, but it went to a Mr. Zhang.

14   You've seen that name before.  So you know where it went.  And

15   apparently Mr. Zhang was someone who was involved in a number of

16   these transactions —

17             THE COURT:  Well, the crypto transaction.

18             MS. LINDAUER:  I'm sorry?

19             THE COURT:  The crypto transaction.

20             MS. LINDAUER:  Yeah, the — yeah, exactly.  So — so,

21   again, I'm just saying to grant a summary judgment based on this

22   without more, with a deposition saying that 'I didn't know

23   anything about this and I didn't have anything to do with it,'

24   to me, there's questions of fact here that require some kind of

25   a trial.

*Plaintiff's Motion for Summary Judgment*                                    65

1      We have a trial set in a month.  I — I think, based on

2   the record you have in front of you, that — that you need more

3   evidence.  I — I think what you have here clearly raises

4   concerns, no question about it, but — but without the testimony

5   to explain what happened here and with a witness saying, 'I

6   don't know anything about this transaction,' to assume that he

7   did without having an opportunity to adjudge his credibility

8   seems to me to be cutting off — look, if I thought there was a

9   valid 727 complaint here, you know, I would just have him waive

10  his discharge.  But when I read all of this, I felt like there

11  were enough questions here that required at least someone to —

12  you, as the trier of fact, to take a look at this and have an

13  actual person testify in front of you what was going on here.

14  And then you could make the decision, yeah, I think he knew

15  exactly what was going on, or, I think he didn't.

16      And, you know, did — did Ray go to the bank and get

17  these funds sent in his father's and mother's name to someone.

18  So — and of course you have Rozmeen's testimony too.  So you

19  have her full transcript also.  So you can read her testimony

20  also regarding a number of these same issues also.  But, you

21  know, at the end of the day, when I look at — I don't think they

22  can get a 523 complaint, honestly.  I don't think they have the

23  basis for false pretenses, false representations, or actual

24  fraud.

25      Now I do think the 727 complaints are far more

1   serious, but I do think that virtually all of those require you

2   to find an intent to hinder, delay, or defraud, or some such

3   language.  So if we look at 727(a)(2), it's intent to hinder,

4   delay, or defraud.

5           If we look at (a)(3), it's conceal, destroy, multi —

6   manip- —

7           THE COURT:  No intent.  No intent on 723(a)(3) —

8           MS. LINDAUER:  Well, but again tell me what recorded

9   information that he has destroyed, failed to maintain or failed

10  to provide.  I mean you're looking at a lot of recorded

11  information here, so what — what are they claiming he should

12  have had —

13          THE COURT:  What about the lack of tax returns alone?

14  Is that a problem —

15          MS. LINDAUER:  Well, he's got — he's got legitimate,

16  two.  They've got these other two that are totally bogus.  So —

17          THE COURT:  Well, he filed bankruptcy April 2023.

18          MS. LINDAUER:  Right.

19          THE COURT:  We've never gotten '20, '21, and '22.

20          MS. LINDAUER:  Well, then the question is did he earn

21  enough income to have to file tax returns those years.  You

22  know, I mean again, I mean the man had — is living on basically

23  Social Security right now.  So, yeah, —

24          THE COURT:  Oh, that's not in his schedules.

25          MS. LINDAUER:  Well, in his schedules he said, I

*Plaintiff's Motion for Summary Judgment*                    67

1  think, he still had some sort of insurance business, but that's

2  been shut down.  Everybody's acknowledged that —

3         THE COURT:  No, he didn't say he had an insurance

4  business —

5         MS. LINDAUER:  What did he have in his — in his

6  schedules for his income —

7         THE COURT:  He says he works as a manager at some

8  company —

9         MS. LINDAUER:  A convenience store.

10         THE COURT:  — in Meridian, in Texas — in Meridian,

11  Texas —

12         MS. LINDAUER:  Was — was it a convenience store?

13         THE COURT:  — making 3,000 a month, getting 500 a

14  month from family and friends —

15         MS. LINDAUER:  Yeah.

16         THE COURT:  He doesn't list any Social Security.

17         MS. LINDAUER:  All right.

18         THE COURT:  And he doesn't have any records of what

19  he's really been doing.

20         MS. LINDAUER:  Well, —

21         THE COURT:  What records do I have?  I don't have tax

22  returns.  I mean there's not an intent element of 5- — of

23  727(a)(3), so I'm a little fixated on that.

24         MS. LINDAUER:  But, again, you have to make a

25  determination, unless such act or failure to act was justified

*Plaintiff's Motion for Summary Judgment*                                    68

1   under all the circumstances of the case.  So, again, you have to

2   — I think you have to talk to the debtor.  I think you have —

3            THE COURT:  Is he going to testify if this goes to

4   trial?

5            MS. LINDAUER:  Yeah.  He testified during his

6   deposition.  He didn't take the Fifth Amendment.

7            THE COURT:  He's not going to take the Fifth?

8            MS. LINDAUER:  No, he will testify.

9            THE COURT:  Okay.

10           MS. LINDAUER:  Now I can't say his son will, but he

11  will.

12           So the other one, (a)(4), false oaths or accounts, the

13  debtor knowingly and fraudulently.  So, again, you've got a

14  knowing and fraudulent requirement in that one.  And it's

15  knowingly and fraudulently, okay.

16           And then (5), fail to explain —

17           THE COURT:  No — yeah, no —

18           MS. LINDAUER:  — loss of —

19           THE COURT:  — no intent on (5).

20           MS. LINDAUER:  I'm sorry?

21           THE COURT:  There is no intent requirement on

22  727(a)(5) —

23           MS. LINDAUER:  (5), right.  But he did testify in his

24  deposition that most of this, he had nothing to do with and

25  doesn't know about.  So, again, I think he did, if you get to

*Plaintiff's Motion for Summary Judgment*                                69

1   it, satisfactorily explain.  Again, that's a question for you to

2   decide, is — is listening to his testimony and deciding whether

3   there is a satisfactory explanation or not.

4          I just don't think these things — look, I think there

5   are some issues that can be resolved on summary judgment, but

6   when it comes to intent, fraudulent behavior, I think you have

7   to judge the credibility of the witnesses.

8          You can read his deposition.  He's going to tell you

9   that he doesn't know about 90 percent of this stuff and had

10  nothing to do with it.  Now you can read it in black and white

11  and you might not — you might think, okay, he's lying.  But I

12  think you have to give him a chance to actually get in front of

13  you and explain, and he will.  He will come testify.  Because,

14  again, look, if I thought there were valid grounds to waive his

15  discharge, I would be discussing with him waiving his discharge.

16         When I looked at all of their evidence, while I had

17  some concerns, I also had explanations.  So I felt like he

18  should have his day in court.  You may not, but I feel like he

19  should.  And I think — I don't think that this lends itself to a

20  summary judgment on a 727 complaint, to be perfectly honest.

21         I mean I've never seen a 727 granted on a summary

22  judgment.  I've seen lots of 523s, where you have a judgment

23  that says fraud or at least findings of fraud, or something.

24  But I've never seen a 727 granted on a — not when there are some

25  intent requirements here.  And — and I think you have to make

*Plaintiff's Motion for Summary Judgment*                70

1   some findings as the judge.

2          And so, really, Your Honor, that was really — I mean

3   you've read this stuff and looked at most of it, I'm sure.  I

4   think there are fact questions here and I think there are

5   credibility questions here.  And I think there is enough

6   evidence here that a summary judgment would not be appropriate.

7          THE COURT:  Okay.

8          MS. LINDAUER:  Thank you.

9          THE COURT:  Thank you.

10         All right.  Mr. Herring, you get the last word.

11         And, just — just to confirm for me, because I did run

12  out of gas reading the 1500 pages, and I wasn't completely clear

13  when I stopped preparing, the entire depositions of the debtor

14  and Rozmeen are in this book?

15         MR. HERRING:  And Raheel as well, Your Honor, to — I

16  mean it's —

17         THE COURT:  But Raheel just sat there and took the

18  Fifth, right —

19         MR. HERRING:  It's the Fifth Amendment 300 times, but

20  it's there.

21         THE COURT:  Okay.

22         MR. HERRING:  Maybe not exactly 300, —

23         THE COURT:  Okay.

24         MR. HERRING:  — but probably close.

25         Your Honor, I don't necessarily think it's productive

*Plaintiff's Motion for Summary Judgment*                                    71

1    to walk through my entire argument.  Again, we painstakingly —

2          THE COURT:  I agree.

3          MR. HERRING:  — cited to the record all the summary

4    judgment evidence that supports our findings —

5          THE COURT:  Let's just — let me encapsulate Ms.

6    Lindauer's argument here.

7          MR. HERRING:  Sure.

8          THE COURT:  And maybe you can encapsulate yours.  But

9    she says there is a lot of smoke there, but for you to find

10   fire, you're going to have to hear him, him, Ismail testify on

11   the stand.  I mean do I —

12         MR. HERRING:  We have — we have identified — no, Your

13   Honor.  We have identified the fire.  We have identified the

14   fire.  There has to be a genuine issue of material fact.  Simply

15   saying the debtor denies it, the debtor denies it, the debtor

16   doesn't know, the debtor doesn't know over and over and over and

17   over again without presenting any sort of summary judgment level

18   evidence to the contrary or to create a genuine dispute —

19         THE COURT:  And I'm — I'm troubled by that.

20         MR. HERRING:  Yeah.

21         THE COURT:  I mean Ms. Lindauer makes a very good

22   point that you never see judges grant a 523 or a 727 at the

23   summary judgment stage.  You almost never do, you know, in a

24   default context that I have.  But, you know, so many of these

25   have an intent element, okay.  Not all of them, not

1   727(a)(3)(5).  But I usually go to trial on these.

2          But the flipside of what she's saying is I usually see

3   a response with, you know, 15 attachments saying:  Here's where

4   I refute that the debtor was president or a managing director of

5   IBF, here is where I refute that this was my tax return, the

6   second one for 2018, you know, here is my signature.  You know I

7   usually have specific refutation.  So weird context for a

8   summary judgment.  I'm not sure her procedure works as far as

9   just:  I adopt the entire response as though it's my sworn

10  testimony.

11         But I'm also, frankly, annoyed that I got entire

12  depositions instead of excerpts.

13         MR. HERRING:  I un- — I mean I understand that, Your

14  Honor.  And — and I've tried to point to the excerpts for the —

15  but leave the whole record and so the record is complete —

16         THE COURT:  Yes, I see what you did.

17         MR. HERRING:  I — I don't want to be accused at any

18  point of ever, you know, leaving out exculpatory evidence, or

19  anything like that.

20         THE COURT:  I understand.

21         MR. HERRING:  I don't think it's there, Your Honor.

22  And I admit, I mean this is — this is rare.  It's asking for a

23  rare relief, I think, in the 523, 727 context.  But here we have

24  sort of an overwhelming amount, I think, of summary judgment

25  quality evidence.

*Plaintiff's Motion for Summary Judgment*                                73

1        We have a debtor who has not participated on the

2    merits of this litigation at all up to this point.  Ms. Lindauer

3    mentioned that he's never been before the Court.  There have

4    been ample opportunities, including I think —

5            THE COURT:  She said he's going to testify, —

6            MR. HERRING:  Well, —

7            THE COURT:  — if we set it for trial.

8            MR. HERRING:  — he might.  He might.  He might.  I

9    mean I have sat through his deposition, including the first one

10   that he —

11           THE COURT:  All right.

12           MR. HERRING:  — terminated early because he was

13   allegedly sick.  Both — both transcripts are in the record.  I

14   don't think we need to judge his credibility in person in order

15   to — to look at the record, see the inconsistencies, see the

16   omissions, see things that simply saying, 'I don't know, I don't

17   know, I don't know' with no further explanation, you know,

18   creates a genuine dispute.

19           THE COURT:  Um-hum.

20           MR. HERRING:  I just don't think it's necessary here.

21   I think it would be sort of futile, frankly.

22       Some of the things that Ms. Lindauer points out,

23   failure to maintain records.  I mean, yes, we have records.  We

24   have records that we had to obtain through third-party discovery

25   because the debtor didn't maintain them.  That speaks volumes.

*Plaintiff's Motion for Summary Judgment*                    74

1          The faults are myriad.  We have walked through them.

2    Failure to explain loss of assets.  Again, not an intent issue.

3    And some — you know, among other things, we have the debtor's

4    claim to Goldman Sachs, which he doesn't deny.  And I think when

5    you look at the pin cite for that, you will see he doesn't deny

6    that he signed a representation to Goldman Sachs that the family

7    collectively had a certain amount of assets and a certain amount

8    of income.  You know, there's no — there's no refutation of

9    that.  There is no refutation of the fact that he had —

10          THE COURT:  I remember reading that.

11          MR. HERRING:  Yes.

12          THE COURT:  The summary judgment evidence of that, can

13   you pinpoint it to me?  Some piece of paper where he represented

14   to Goldman Sachs, —

15          MR. HERRING:  I can, Your Honor.

16          THE COURT:  — 'I have x amount of' —

17          MR. HERRING:  Give me to find it in my outline, but I

18   can, Your Honor.  This is where I wish I had a word search built

19   into my brain.

20          Ah, that's at Appendix 1174.

21          THE COURT:  Okay.  So quiet profile and investment

22   objectives; estimated annual income, 6.2 million; total assets,

23   50 million.  Net investable assets, 92 million.  Okay.  So this

24   shows Ismail first as account holder.  Raheel and Rozmeen.  It

25   looks like Ismail and Raheel signed it.

*Plaintiff's Motion for Summary Judgment*                    75

1          I don't have a date on this.  Should I see the date

2    somewhere and I don't?

3          MR. HERRING:  I'm not sure that this was dated, Your

4    Honor.

5          THE COURT:  Okay.  All right.

6          MR. HERRING:  I don't — I can tell you that I don't

7    think we have any reason to believe that it wasn't before the

8    loan was made, after the fraud of it was.

9          THE COURT:  Okay.

10          MR. HERRING:  Most of the Goldman Sachs records were

11    from some period of time before the loan was made.

12          That being said, I want to address something Ms.

13    Lindauer briefly said about bank statements.  Yes, there are

14    bank statements here that predate one year before — this is with

15    respect to transfers — one year before the petition date.  But

16    all of the transfers we have complained of were within a year.

17    And I think I have given the cites for that.  It's the June —

18    essentially, the April, June, and July — I guess April, May,

19    June, and July statements for the family Bank of America

20    account.

21          THE COURT:  Um-hum.

22          MR. HERRING:  Which, again, going back to that, we

23    have an account with the debtor's name on it.  We have millions

24    of dollars coming in and leaving.  Nothing more than, 'I don't

25    know about it' to address the debtor owns this account and is

*The Ruling of the Court*                                    76

1   alleged to have known this account.  No evidence of this idea

2   that he was a convenience owner, whatever that means, or

3   nonowner, I think is what the amended schedules say.  Schedules

4   that were amended only, I believe, after the 341 meeting when we

5   asked about some of these things.

6           I'm not sure that the judgment issue, Ms. Lindauer

7   made an issue out of the judgment and they're not being specific

8   findings, we've never argued collateral estoppel —

9           THE COURT:  Right.

10          MR. HERRING:  — for that reason.  It was a default

11  judgment and it wasn't even appropriate.

12          THE COURT:  Um-hum.

13          MR. HERRING:  And that's really — that's really it,

14  Your Honor.  We have nothing to — we have nothing that rises to

15  the level of creating a genuine dispute of fact as to all of

16  these sort of — sort of precisely-cited things in the record

17  that support our — our arguments.

18          THE COURT:  Okay.  Thank you.

19                    THE RULING OF THE COURT

20          THE COURT:  All right.  Well, we have all kind of

21  alluded to this being, well, I don't know, it's just not your

22  ordinary situation and, in different ways, it's not your

23  ordinary situation.

24          I think of everything that I find unusual, the most

25  unusual part of this is — well, I'm stating what surely is on

*The Ruling of the Court*                                              77

1   all of our minds:  We have a son of a debtor who has bled — who

2   has pled guilty to wire fraud.  That's the federal crime, right?

3   Wire fraud.  He is, I guess, going to be sentenced some time

4   soon.  So I guess he said, you know:  Mea culpa, I did it.

5            And now we have a father in bankruptcy who is, I guess

6   his defense is he's pointing the finger at his son:  Look, my

7   son pled guilty; and, look, he did it all; I don't know

8   anything.

9            I'm tempted to be a little bit flippant.  My husband s

10  a retired cop and I've learned a lot of cop lingo over the

11  years.  And he's talked about the Shaggy defense.  You know what

12  I mean about the Shaggy defense?  It comes from some pop story

13  who his famous defense was:  It wasn't me, it wasn't me, it

14  wasn't me.  That was R. Kelly actually.  And he — I can't

15  believe I'm talking about this.  But, anyway, this is sort of

16  like the Shaggy defense to a 727, 523:  It wasn't me, it was my

17  son.  And it's just — it's — I've never seen anything like it.

18           You know, it appears we have a close-knit family.

19  They live in the same house, they travel together, they worship

20  together.  They are allegedly in a lot of businesses together.

21  But, okay, this is:  It's my son's fault, it's not me.

22           So I'm very — I'm very torn today.  I will tell you I

23  came in here today, and I'm not going to tell you which two

24  counts it was.  I came in here today thinking based on this huge

25  notebook, I may have to grant summary judgment on a couple of

*The Ruling of the Court*                                                                 78

1   these counts.  And then I thought, ah, I'll probably have to go

2   to trial on everything else.  You can figure out what I'm

3   talking about, 727(a)(3) and (a)(5).  They don't have a

4   fraudulent intent requirement.  And I wasn't sure I had refuting

5   summary judgment evidence from the debtor to counteract these

6   huge notebooks of Benefit Street.  But now I'm hearing, oh, if

7   you had sifted through those deposition transcripts carefully,

8   you would have seen he denied this, that, and the other.

9         So given that we are set for trial the week of July

10  15th, I think it makes more sense, and the District Court, the

11  Fifth Circuit would think I exercised proper discretion if I

12  went ahead and set this for trial, the whole darn thing, and

13  since it is so close, I think that is what makes sense.

14        I think there's a mountain of evidence here that

15  Benefit Street — you know, I don't know if they have more than

16  what's in the notebook, but if it's just what's in the notebook

17  that's a lot of evidence.  And the debtor can explain it.  And

18  his explanations will either be credible or they won't.  And so

19  that's what's I'm going to do.  I'm going to deny the motion for

20  summary judgment and say this is going into trial in July.

21        Do not ask me for a continuance because if you do, I

22  may drill back down on the — I just — I'm erring on the side of

23  denying this motion because I think we're going to go trial in

24  July and it would take me a month to write up my ruling on the

25  motion for summary judgment anyway.  So we'll just hear the

*The Ruling of the Court*                                   79

1   evidence.  Strange, strange, strange.

2        I don't know why Ismail Bhai wants to get on the stand

3   and testify in his own defense in a way that's going to maybe

4   harm his son and, for all I know, Rozmeen.  But the clients make

5   these decisions for reasons that I don't always understand.

6        So I want you all to get together and talk about

7   stipulated evidence.  I don't want to spend time bogged down in

8   a multi-day trial over objections to exhibits and da-da-da-da,

9   if you just agree.  I mean a lot of this stuff, the loan

10  agreement, the promissory notes, many other things in here, I

11  would think you could stipulate to so we wouldn't have to waste

12  time with that.  I'm thinking we're only going to have the

13  debtor as a witness?  Maybe someone from Benefit Street.  I

14  doubt we're going to have 20 witnesses, right?

15       How many days do we think this would take?

16       MS. LINDAUER:  I just was asking that.  I can't

17  imagine more than two.  And I'm not sure we even have two.  I

18  mean if we stipulate to a lot of the exhibits, it's basically

19  the debtor, maybe his wife.  Ray would probably take the Fifth,

20  so there's probably no reason to call him if they want to call

21  him.  I don't even know if they need anybody from Benefit here.

22  That's up to them.  But I'm thinking two days.  And, you know,

23  maybe not even that much.

24       THE COURT:  Mr. Herring.

25       MR. HERRING:  It's likely two to three, I mean it

1   depends on what we're able to stipulate to, of course.

2            THE COURT:  Okay.

3            MR. HERRING:  Three, on the outer edge, I think.

4            THE COURT:  All right.  Well, if you all could talk to

5   Traci, my Courtroom Deputy, I don't see her on the line right

6   now, but I don't know — well, let me see if she's by her phone

7   and answers, so we could like nail down the 15th.

8            MS. LINDAUER:  Sure.

9            THE COURT:  I know we were possibly going to have, I

10  think, a jury trial that week, but now they have actually

11  reconsidered.

12           She's not answering.  So if y'all could just follow up

13  with her by email and confirm that we can do the 15th and 16th.

14  You know, we'll just go ahead and block those.

15           And then I guess we'll go ahead — you probably have a

16  scheduling order that shows trial docket call, what, seven days

17  before that?

18           MS. LINDAUER:  Yeah, it shows it on July 8th at 1:30.

19           THE COURT:  Okay.  So we'll go ahead and keep that set

20  in case y'all have pretrial matters that we need to go over, but

21  we could — we could probably do that by video unless you think

22  we need to all be here in the courtroom.  You know, hopefully we

23  won't have pretrial housekeeping matters, too many of them.  But

24  if we do, we can address them on that day.

25           All right.  Well, I'll see you next month, not sooner.

*The Ruling of the Court*                                    81

1          MS. LINDAUER:  Thank you, Judge.

2          COURT SECURITY OFFICER:  All rise.

3     (The hearing was adjourned at 4:28 o'clock p.m.)

4                          —o0o—

State of California          )
                             )     SS.
County of Stanislaus         )


            I, Susan Palmer, certify that the foregoing is a true
and correct transcript, to the best of my ability, of the above
pages, of the digital recording provided to me by the United
States Bankruptcy Court, Northern District of Texas, Office of
the Clerk, of the proceedings taken on the date and time
previously stated in the above matter.

            I further certify that I am not a party to nor in any
way interested in the outcome of this matter.

            I am a Certified Electronic Reporter and Transcriber
by the American Association of Electronic Reporters and
Transcribers, Certificate Nos. CER-124 and CET-124.  Palmer
Reporting Services is approved by the Administrative Office of
the United States Courts to officially prepare transcripts for
the U.S. District and Bankruptcy Courts.


            Susan Palmer
            Palmer Reporting Services
            2129 Golden West Lane
            Modesto, California  95350
            (209) 915-3065

            Dated December 11, 2024